(744 P.2d 146)
No. 60,132

STATE OF KANSAS, *Appellee*, v. GREG KIRBY, *Appellant*.

Opinion filed October 8, 1987.

*Lucille Marino*, assistant appellate defender, and *Benjamin C. Wood*, chief appellate defender, for the appellant.

*Eric S. Rosen*, assistant district attorney, *Gene M. Olander*, district attorney, and *Robert T. Stephan*, attorney general, for the appellee.

Before DAVIS, P.J., REES and BRISCOE, JJ.

BRISCOE, J.: Defendant, Greg Kirby, appeals his conviction on one count of burglary (K.S.A. 21-3715) and one count of theft (K.S.A. 1986 Supp. 21-3701).

Defendant contends the trial court erred (1) in denying defendant's motion to suppress evidence which was seized; and (2) in denying defendant's motion to suppress his confession. Defendant argues the court should have suppressed the evidence because it was obtained pursuant to an illegal stop and as a result of an illegal search and seizure. He argues his subsequent confession was also tainted by the illegal search and seizure.

In the early morning hours of April 17, 1986, Shawnee County Deputy Sheriff Schmelzle was patrolling northbound on Urish Road in rural Shawnee County when he observed a pickup truck parked on the side of the road at about the 400 block of Urish Road. The truck was facing south with its headlights off and its domelight on. As the deputy approached, the domelight was

switched off and, as he passed, the truck was started and driven south. The deputy turned around and followed the truck. At the suppression hearing, the deputy testified he decided to follow the truck because of reports of deer poaching in that area.

As the deputy followed the truck, he observed there were some articles in the truck bed covered by a tarp. He also observed that the truck had no license tag but did have a small piece of paper taped in the window. After following the truck to SW 10th, the deputy stopped the truck. The deputy approached the cab of the truck and shined his flashlight into the cab to check for weapons, but saw no weapons or anything else out of the ordinary. He asked the driver and his passenger for identification. Each provided the deputy with a Kansas driver's license. The deputy identified the driver as defendant and the passenger as John Keith, Jr. The deputy asked defendant what was under the tarp. His response was unresponsive: he stated they had been working on the truck all day. The deputy then asked if he could look under the tarp. Defendant asked the deputy if he had a search warrant, to which the deputy responded in the negative.

As the deputy walked back toward his patrol car, he looked into the bed of the truck and saw what he believed to be the outline of the back of a TV underneath the tarp. He then radioed the sheriff's department for assistance. The sheriff's department in turn called for a back-up from the Topeka police department.

Officer Steve Taylor of the Topeka police department responded to the call. When the police officer arrived, he was advised of the situation by Cpl. Bentley, who had also recently arrived from the sheriff's department. Taylor and Bentley proceeded to remove the tarp from the back of the truck. In the truck bed were a microwave oven, a VCR, a 19-inch color TV, a 13-inch black and white TV, and various VHS video tapes. After the tarp was removed and the items recovered, the officers ordered defendant and his passenger to get out of the truck and then patted them down for weapons. The officers recorded the serial numbers of the items and ran them through the computer to determine if they were reported stolen. None of the items were reported stolen. Defendant and his passenger were then asked if they owned the property, to which they responded in the negative. They claimed they found the items along the road.

A warrant check of defendant's and the passenger's names was also conducted with negative results. Officer Taylor then looked through the passenger window into the pickup cab where he saw a leafy substance which he believed to be marijuana, along with an orange package of ZigZag papers lying in a Frisbee. On the basis of his belief that the truck contained marijuana, the officer had the truck and its contents towed to police headquarters. An inventory search of the vehicle was then conducted, which resulted in the rediscovery of the television sets, the VCR, and the microwave oven. Defendant and the passenger were not taken into custody but were left on Urish Road to find their way home.

Later that same day, Mrs. Zayac, a neighbor of Robert Clark, notified the police department that the Clark residence had been broken into and burglarized. The Clarks had asked Mrs. Zayac to watch their house while they were on vacation. After the Clarks returned, Robert Clark contacted the police department on April 21 to report what items had been taken. He later went to the police department and positively identified the items seized from the truck as items stolen from his residence.

On April 22, defendant contacted the police department and asked how he could recover the truck. The police department contacted the sheriff's department concerning defendant's inquiry. Detective Mike Ramirez of the sheriff's department told the police department that defendant would have to talk to him to recover the truck.

Defendant contacted Ramirez by telephone and, on April 22, the defendant went to the police station to meet with Ramirez. The detective read the defendant the *Miranda* warnings before the interview. During the interview, defendant signed a statement which implicated both himself and Keith in the burglary of the Clark residence. Defendant was then arrested and charged with burglary, theft, criminal damage to property, and possession of marijuana.

On May 27 and 28, a preliminary hearing was held and the court found there was probable cause to bind defendant over for trial. The defendant filed a motion to suppress the evidence seized and his confession. A suppression hearing was held and the motion was denied both as to the evidence and the confession.

The defendant waived his right to a jury trial and then stipulated that the testimony heard during the preliminary hearing would be the same if the witnesses were called again at trial. Additionally, it was stipulated that the defendant was an employee of Aard's Trash Company and that Mrs. Zayac would testify that she told defendant the Clarks were out of town on the day their house was burglarized. The defendant, however, renewed his objection as to the admissibility of the items seized from the truck and the confession. The State dismissed one count of criminal damage to property and one count of possession of marijuana. The court then found defendant guilty of burglary and felony theft.

## Suppression of Evidence Seized

The trial court denied defendant's motion to suppress and held the evidence seized from the truck bed was admissible. In reaching this conclusion, the court first held the initial stop was reasonable and the marijuana subsequently seen in plain view justified the towing of the truck, which led to the inventory search of the truck, yielding the items found in the truck bed.

Defendant contends the stop was unreasonable and in violation of the Fourth Amendment because the officer lacked a reasonable and articulable suspicion to justify the stop. Defendant further contends the subsequent search was not justified whether the initial stop was proper or not. Defendant argues that, if the stop was improper, the subsequent search was tainted; if the stop was proper, the subsequent search was still improper because it exceeded the limited scope of a permissible search incident to a stop.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250, 251, 35 L. Ed. 734, 11 S. Ct. 1000 (1891).

In *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868

(1968), the United States Supreme Court concluded a "stop and frisk," the on-the-street stop of an individual by the police and subsequent pat-down of the individual for weapons, did entail a seizure of the individual and a search. In concluding that the stop and subsequent limited search were not violative of the Fourth Amendment, the Court pursued a two-pronged inquiry: Whether the officer's action in stopping the individual was justified at its inception, and whether the search was reasonably related in scope to the circumstances justifying the initial stop. The Court found a "stop and frisk"—"necessarily swift action predicated upon the on-the-spot observations of the officer on the beat"—is not police conduct subject to the warrant clause of the Fourth Amendment requiring "probable cause" to justify the search and seizure. The conduct involved is, instead, tested by the Fourth Amendment's general proscription against unreasonable searches and seizures. 392 U.S. at 20. As further stated by the Court, there is no ready test for determining the reasonableness of a search or seizure other than by balancing the need to search or seize against the invasion which the search or seizure entails.

Our legislature has codified the "stop and frisk" in K.S.A. 22-2402, which provides:

"(1) Without making an arrest, a law enforcement officer may stop any person in a public place whom he reasonably suspects is committing, has committed or is about to commit a crime and may demand of him his name, address and an explanation of his actions.

"(2) When a law enforcement officer has stopped a person for questioning pursuant to this section and reasonably suspects that his personal safety requires it, he may search such person for firearms or other dangerous weapons. If the law enforcement officer finds a firearm or weapon, or other thing, the possession of which may be a crime or evidence of crime, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person."

The Kansas Supreme Court has held that a "stop and frisk," under our statute, requires that the officer have a reasonable and articulable suspicion, based on fact, that the person stopped has committed, is committing, or is about to commit a crime. *State v. Epperson*, 237 Kan. 707, 712, 703 P.2d 761 (1985). "Reasonable and articulable suspicion" does not rise to the level of probable cause. The reasonableness of the search is determined by the

trial court from the facts and circumstances of the case. *State v. Jackson*, 213 Kan. 219, 225, 515 P.2d 1108 (1973).

The issue before this court is whether the trial court's denial of the motion to suppress was based on substantial evidence. If the findings of the trial court on a motion to suppress evidence are based upon substantial evidence, this court on review will not substitute its view of the evidence for that of the trial court. *State v. Chiles*, 226 Kan. 140, 144, 595 P.2d 1130 (1979); *State v. Parks*, 5 Kan. App. 2d 644, 645, 623 P.2d 516 (1981). The trial court found the deputy's articulated suspicion to justify his stopping the truck was reasonable. The deputy stated the stop was based upon his knowledge of deer poaching in the area, the early morning hour, the fact the truck headlights were off and the domelight was on, a tarp was covering something on the truck bed, and the absence of a license tag.

In each case involving a *Terry* stop, whether the officer has a reasonable and articulable suspicion to justify a stop will depend upon facts unique to that case. In a number of cases, the Kansas Supreme Court has recognized that the location, time of day, previous reports of crime in the area, and furtive actions of suspects may well justify a stop. *State v. Holthaus*, 222 Kan. 361, 564 P.2d 542 (1977) (stop reasonable where police investigating possible burglary observe pickup drive by twice and driver interested in police activity, driver appeared nervous as police approached, and driver's story on how he obtained truck was suspicious); *City of Garden City v. Mesa*, 215 Kan. 674, 527 P.2d 1036 (1974) (police justified in asking defendant for identification as he stood in doorway of business at four in the morning); *State v. Hazelwood*, 209 Kan. 649, 498 P.2d 607 (1972) (stop reasonable where police, after working burglaries and while looking for suspects, observed a man duck into an alley and hide behind vehicles at four in the morning). It is equally clear, however, that the time of day and reports of crime in the area will not *in and of themselves* justify an investigatory stop. In *Jackson*, 213 Kan. 219, the court held unreasonable the stop of a man walking alone on a rural highway at 2:50 in the morning. Although the incident occurred during early morning hours, there was no evidence of furtive conduct, police knowledge of crime in the area, or any other suspicious conduct.

In *Epperson*, 237 Kan. 707, the court held unreasonable a stop of two men at two in the morning when they appeared startled by the appearance of a patrol car, one reached down to the floorboard area, and both got out of the car and began walking away. The officer was patrolling in the area because "[t]here was a problem with burglaries in this particular area." According to the court, the officer had no knowledge of a prior crime, he did not observe any criminal offense, and the car was lawfully parked near a club which was open. The actions of the men were not indicative of criminal conduct and the fact that the men were well-dressed occupants of an expensive car did not fit the profile of burglary suspects. According to the court, the officer was suspicious but had no objective fact upon which to form a belief that the men were involved in criminal activity.

In the present case, the trial court had substantial evidence upon which to base a finding that the deputy had a reasonable and articulable suspicion to justify the stop. Although none of the facts cited by the court in and of themselves would support reasonable suspicion, taken together, these facts are sufficient. The deputy was aware of reports of deer poaching in the area. A pickup truck parked on a rural road with its lights out and with something in the truck bed covered with a tarp would support the officer's suspicions. In addition, the absence of the license tag would give the officer grounds to check the validity of the temporary sticker. See *State v. Hayes*, 8 Kan. App. 2d 531, 660 P.2d 1387 (1983) (valid stop when license tag partially obscured). The facts of this case are also distinguishable from *Epperson*. In that case, defendant was stopped in town, near businesses that were open. Here, defendant was stopped on a rural road after his truck was observed parked with its lights off. The tarp covering something in the truck bed is an additional objective fact which tended to implicate defendant in poaching, a type of fact not found in *Epperson*.

Defendant argues that, even if the initial stop was legal, the subsequent search and seizure of his truck and the articles contained in it were not. The State argues the search and seizure were proper. According to the State, the marijuana was observed in plain view, justifying the towing of the truck and the subsequent inventory search. The State relies on the inventory

search to validate the search and seizure of the items in the truck bed.

We agree with the defendant that the search of the truck bed was illegal. The search consisted of removing the tarp, removing items found in the truck bed, and running the serial numbers of the items through police computers to determine if they were stolen. This search exceeded the scope of a *Terry* search. The sole justification for a *Terry* search is the protection of the police officer and others nearby and it must, therefore, be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for an assault against the police officer. *Terry v. Ohio*, 392 U.S. at 29. The preservation of evidence is not a permissible purpose. *Terry*, 392 U.S. at 29; *Epperson*, 237 Kan. at 715.

The duration of the *Terry* stop in the present case was also excessive. " '[T]he brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion.' " *United States v. Sharpe*, 470 U.S. 675, 685, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985) (quoting *United States v. Place*, 462 U.S. 696, 709, 77 L. Ed. 2d 110, 103 S. Ct. 2637 [1983]).

Here, the defendant was detained while an illegal search of the truck was conducted. Deputy Schmelzle testified that he took pictures of items removed from the passenger compartment and truck bed one-half hour after the truck was originally stopped. Therefore, defendant was detained at least one-half hour after the original stop.

While the Supreme Court has refused to set any time limit on a proper *Terry* stop, it has recognized that "[o]bviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." *Sharpe*, 470 U.S. at 685. In determining whether a *Terry* stop is too long, the Supreme Court looks to "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686.

This court has recognized that a *Terry* stop, based upon less than probable cause, is limited in its scope and duration. Any

involuntary detention beyond questioning and a pat-down for weapons must be supported by probable cause. *State v. Parks*, 5 Kan. App. 2d at 645. In the present case, the State points to no facts which would justify the continued detention of defendant after the officer's initial questioning of the defendant. Although the deputy did suspect stolen property was in the truck bed, nothing in the record indicates the deputy had either a reasonable and articulable suspicion to detain or probable cause to search. The deputy did not question defendant about what he thought was a television underneath the tarp. Instead, he called for backup and an illegal search was conducted after the arrival of the additional officers.

The continued detention of the defendant directly affected the observation of the marijuana. The plain view exception requires (1) the initial intrusion which afforded authorities the plain view must be lawful; (2) the discovery of the evidence must be inadvertent; and (3) the "incriminating character" of the article must be "immediately apparent" to searching authorities. *State v. Galloway*, 232 Kan. 87, 91, 652 P.2d 673 (1982). Since the initial intrusion, here the continued detention of defendant, was illegal, the first part of the plain view test is not met. The marijuana was not observed by the deputy when he lawfully conducted his initial investigation after stopping the truck. Only after defendant was detained beyond the initial stop was the discovery made. As a result, the discovery of the marijuana does not fall within the plain view exception and the resulting tow-in and inventory search of the truck were improper.

Suppression of Subsequent Confession

Having concluded the search of the truck bed was illegal and the evidence seized should have been suppressed, we must next consider whether the defendant's subsequent statements were so tainted by the illegal search as to also be rendered inadmissible. *State v. Childers*, 222 Kan. 32, 40, 563 P.2d 999 (1977). According to the United States Supreme Court, evidence is not "fruit of the poisonous tree" merely because it would not have come to light except for the illegal police activity. Instead, the inquiry is whether the evidence objected to came to light by "exploitation of that illegality." *Brown v. Illinois*, 422 U.S. 590, 599, 45 L.Ed. 2d 416, 95 S. Ct. 2254 (1975); *Wong Sun v. United*

*States*, 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); *State v. Knapp*, 234 Kan. 170, 176, 671 P.2d 520 (1983).

Defendant argues that he was forced into presenting himself to the detectives to get the truck back, which would not have occurred had there been no illegal search and seizure of the truck. Defendant also contends that *Miranda* warnings alone are not sufficient to purge the taint of the illegal seizure. The State responds that, if the search and seizure were illegal, the taint of the illegality was sufficiently attenuated to still allow the admission of defendant's confession.

In *Knapp*, 234 Kan. 170, Syl. ¶ 3, the Kansas Supreme Court sets forth four factors to be considered in determining if evidence obtained following an *illegal arrest* is sufficiently attenuated to allow admission of the evidence: (1) Whether *Miranda* warnings were given; (2) the temporal proximity of the illegal arrest and the statement, confession, or consent to search; (3) the purpose and flagrancy of the officer's misconduct; and (4) other intervening circumstances. See *Brown v. Illinois*, 422 U.S. 590. Although the Supreme Court has not directly addressed a case involving a confession following an *illegal search*, other courts have considered the factors set forth in *Knapp* in illegal search cases. *Wilkerson v. United States*, 432 A.2d 730 (D.C. 1981); *People v. Robbins*, 54 Ill. App. 3d 298, 369 N.E.2d 577 (1977). See *Childers*, 222 Kan. 32 (statement following illegal search not excluded because not triggered or induced by illegal search).

Here, in following the analysis of *Knapp*, we find *Miranda* warnings were given to defendant by Detective Ramirez before the questioning began.

As regards the second factor in *Knapp*, we are to consider the temporal proximity between the illegal search and the confession. In *Wong Sun*, 371 U.S. at 488, the United States Supreme Court found sufficient attenuation where "several" days had passed. In contrast, in *Brown*, 422 U.S. at 604, the court found no attenuation where only two hours had passed. In the present case, the confession was made five days after the search, which would weigh in favor of attenuation.

In weighing the third factor, the flagrancy and purposefulness of the police conduct, we consider whether the illegal search was undertaken in bad faith. *State v. Knapp*, 234 Kan. at 177-78.

There is no evidence from the facts which would indicate the initial stop, detention, and search were conducted in bad faith.

As regards the fourth factor, "other intervening circumstances," two important questions arise: First, were the acts of the defendant in returning to the police station to obtain the release of the truck and in making the confession acts of free will sufficient to purge the primary taint of the illegal search (*Wong Sun*, 371 U.S. at 486)? Second, was the confession primarily the result of the police confronting the defendant with illegally obtained evidence, thus clearly an "exploitation of that illegality" (*Brown*, 422 U.S. at 599)?

In the present case, the defendant made the initial contact with the police to obtain the release of his father's truck. Defendant initiated this contact four days after the burglary. He was told he would have to talk with Detective Ramirez. When setting up the meeting by telephone, Detective Ramirez told defendant that the vehicle contained property which had been reported stolen and that he wanted to talk to the defendant about it. The record does not indicate whether Detective Ramirez ever confronted the defendant with the evidence seized.

In *Wong Sun*, 371 U.S. at 491, the United States Supreme Court recognized that an act of free will by the defendant will sufficiently purge the taint of the earlier illegality. There, Wong Sun had been released on his own recognizance following a lawful arraignment and returned voluntarily several days later. In the present case, although defendant made the initial contact with the police and his contact was several days after the illegal search, he contacted the police because they had possession of his father's truck. However, defendant knew the sheriff's department had possession of items seized from the truck; that Detective Ramirez knew the items had been reported stolen; and that Detective Ramirez wanted to talk with defendant about the stolen items. Armed with this knowledge, defendant went to talk to Detective Ramirez anyway. We conclude this was an act of free will sufficient to attenuate the confession.

We next consider whether defendant's confession was the result of the police confronting defendant with the illegally seized evidence, or the result of defendant exercising his own free will. In most cases where the defendant is confronted with

the illegally seized evidence, unless there is some other intervening circumstance, such as an act of free will, the confession will be "an exploitation of the illegality." 4 LaFave, Search and Seizure § 11.4(c), p. 403 (2d ed. 1987). The theory is that the defendant is induced into confession because he is caught "redhanded." See *Ruiz v. Craven*, 425 F.2d 235 (9th Cir. 1970); *Amador-Gonzalez v. United States*, 391 F.2d 308 (5th Cir. 1968); *People v. Robbins*, 54 Ill. App. 3d 298. Defendant's argument that "but for" the illegality, the statement would not have been made has specifically been rejected by the Supreme Court. *Brown*, 422 U.S. at 599. The issue instead is the exploitation of the illegality.

In the present case, we have no evidence that defendant was actually confronted with the seized evidence. As the trial court found, defendant was not under arrest, nor did he feel any fear or pressure from the police to either initially contact them or subsequently meet with the detective. His motive in going to the station and giving a statement was purely personal. Upon consideration of the factors set forth in *Knapp*, we conclude the trial court had substantial evidence to find that defendant's initial contact with police and his later meeting with the detective were acts of "free will which purge the taint" of the original illegality.

Since the confession was properly admitted, but the items seized from the truck were not, the question becomes whether the admission of the seized items was reversible error. Errors which do not affirmatively appear to have prejudicially affected the substantial rights of the party complaining do not require reversal when substantial justice has been done. *State v. Bell*, 239 Kan. 229, 235, 718 P.2d 628 (1986); *State v. Logan*, 8 Kan. App. 2d 232, 236, 654 P.2d 492 (1982), *rev. denied* 232 Kan. 876 (1983).

Although an uncorroborated extrajudicial confession is insufficient to sustain a conviction (*Opper v. United States*, 348 U.S. 84, 89-90, 99 L. Ed. 101, 75 S. Ct. 158 [1954]; *State v. Tillery*, 227 Kan. 342, 346, 606 P.2d 1031 [1980]), we have more than that here. While it is true the trial court erred in denying the motion to suppress all of the evidence seized at the April 17, 1986, stop, which would include all of the items removed from the truck, photographs made, and the officers' testimony, the stipulated

evidence would remain for consideration along with the confession. The parties stipulated that defendant was an employee of Aard's Trash Company and that Mrs. Zayac would testify she told defendant the Clarks were out of town on the day their house was burglarized. This remaining evidence, when viewed in the light most favorable to the prosecution, was sufficient to support the defendant's convictions of burglary and theft.

Affirmed.