Nos. 68,194
68,258

STATE OF KANSAS, *Appellant,* v. JOHN HODGES, *Appellee.*

(851 P.2d 352)

Opinion filed April 16, 1993.

*Barry R. Wilkerson,* assistant county attorney, and *Robert T. Stephan,* attorney general, were on the brief for appellant.

*Steven L. Opat,* of Harper, Hornbaker, Altenhofen, and Opat, Chartered, of Junction City, and *Greg Kieffer,* of Caffey, Kieffer & Jones, of Manhattan, were on the briefs for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an appeal by the State of Kansas, pursuant to K.S.A. 22-3602(b)(1), from the district court's orders suppressing evidence and dismissing burglary charges against John Hodges in two cases which have been consolidated on appeal.

The State asserts three issues on appeal:

(1) The district court erred in finding the vehicle stop was not lawful;

(2) the district court erred in finding that defendant Hodges had standing to seek suppression of the evidence seized in the search of the automobile and of the confession of codefendant Robert Lankster; and

(3) even if the officer lacked reasonable suspicion to make the stop, there was not substantial competent evidence to support the district court's suppression of Lankster's confession.

There is no dispute as to the facts. On March 3, 1992, Officer Sill was assigned to surveillance of the business district of Manhattan because there had been more than 20 burglaries of businesses in the preceding two-week period. At 10:45 p.m. he saw a car with a Shawnee County tag which was traveling very slowly. There were three black males in the car, and they were slouched low in their seats.

Officer Sill followed the car. It eventually was driven through the parking lot of the Food 4 Less store and stopped at a corner of the lot. Officer Sill temporarily lost sight of the car. When he located it again, there was only one person in the car.

Officer Sill drove out of the parking lot and down a nearby street where he saw two black males walking. He went back to the Food 4 Less store, went in, and checked around for black males. He saw none in the store. Back out in the parking lot, he saw the occupant of the car watching his movements.

The activity observed by Sill seemed suspicious to him because it fit the hypothesized activity of recent burglaries. He testified that the pattern of the burglaries was for several adjoining or nearby businesses to be burglarized on one night. For this reason it was believed that the burglars were going from one business to another on foot. The Food 4 Less store was the only store in the immediate area where the two men were walking which was open for business, and the two men who had been in the car when Sill first saw it were not in the Food 4 Less.

Officer Sill called Officer Howser, who reported that he also had seen two black males on foot on the street where Sill had seen them. Then Officer Sill saw two black males get into the

parked car. The car was driven slowly out of the parking lot, down a few blocks, and then three times around a block.

After the men had circled the block, they drove to the Village Inn restaurant. They went inside and stayed for approximately 30 minutes. The police maintained a watch on the car.

When the men came out they got back into the car and headed out of town. Officer Sill followed them, and, as the car neared Interstate 70, Officer Schuck, who was driving a patrol car, stopped the car. The stop was not based on a traffic violation, and the officers had no reason to believe that the suspects were trying to flee or elude them or that a crime was going to be committed.

According to Sill, the suspects' car was still in Riley County when Officer Schuck turned on his emergency lights. The stop was made, however, in Geary County.

The men were frisked and detained for questioning. Boykins, who was driving, gave Officer Sill permission to search the car. In the trunk he found two screwdrivers and a pry bar. On the front seat there was a glass vial with a burned residue in it. On the floorboard there was a jacket with a large sum of money wrapped inside it.

The men were arrested. The following morning they appeared in court in Riley County. Lankster, who was the third man in the car along with Boykins and Hodges, had his bond set at $25,000, and he was unable to post that amount. By mid-afternoon, Lankster summoned an officer for the purpose of making a deal with the police and making a statement. Hodges was implicated in the business burglaries by Lankster's confession.

Hodges was charged in the two cases with more than 20 counts of burglary. The facts and issues in the two cases are identical. In each case the district court granted defendant's motion to suppress the evidence which had been collected in the search of the car and to suppress the confession of Lankster. With no evidence available for use against Hodges, the district court ordered that the charges be dismissed.

In pertinent part, the district court's journal entry and order of dismissal states:

"If the officers had stopped the vehicle in which the Defendant was a passenger when it was circling the city parking lot, the stop would have

been justified, because at that time, there were sufficient facts to justify a reasonable, articulable suspicion that the occupants of the car were about to commit a crime.

"The law enforcement officers lost their basis for stopping the vehicle when the vehicle headed out of town and there was no longer a suspicion that a crime was about to be committed.

"Pursuant to K.S.A. 22-2401a, Riley County law enforcement officers may exercise their powers as long [sic] as law enforcement officers in Geary County if they are invited or requested to do so by Geary County officers, or when in fresh pursuit of a person.

"As defined by the statute, fresh pursuit means pursuit of a person who has committed a crime or who is reasonably suspected of having committed a crime.

"There are no facts in the record to substantiate a reasonable suspicion by the officers that a crime had been committed when the vehicle was stopped in Geary County.

"At the time that the vehicle was stopped, the officers were without jurisdiction to exercise their authority as law enforcement officers within Geary County, and upon this basis, the Court feels that the physical evidence seized pursuant to the stop, must be suppressed.

"The Court further finds that pursuant to U.S. vs. Ceccolini, 435 U.S. 268 (1978), the live testimony of a witness can be subject to suppression as fruit of the poisonous tree, unless it falls within one of the recognized exceptions.

. . . .

"When considering all the circumstances, the Court finds that the illegal stop of the vehicle in which defendant was a passenger led to the discovery of Lankster as a witness and to the confession by Lankster.

"The Court is persuaded that there were not sufficient attenuating circumstances between the illegal stop and the confession and testimony of co-defendant Lankster to create an exception to the Exclusionary Rule, and consequently, the co-defendant's confession and testimony cannot be admitted as evidence against this defendant."

We first consider whether the automobile stop was lawful. The district court stated that before the suspects went to the Village Inn a stop would have been justified. The district court reasoned, however, that

"at that point in time [the police] lost their basis to stop the vehicle because [of] the fact that the vehicle was no longer doing anything suspicious, and there was no reason to think that there was a crime about to be committed. They were heading south out of town. They were followed all the way to the interstate. The testimony of the officers was that there was no violation of any traffic ordinance whatsoever, the vehicle drove at or below the speed limit all the way. The testimony of the officers was that there was no reason

to believe that the vehicle was [going] to flee or elude officer Schuck by the time that he finally got there."

The linchpin in the district court's analysis and conclusion was that the suspicious activities had occurred in Riley County, but the stop occurred in Geary County. The stopping officer, Schuck, was with the Riley County Police Department. Officer Sill, also of the Riley County Police Department, had requested an officer in a patrol car to make the stop.

In *State v. Hennessee,* 232 Kan. 807, Syl. ¶ 2, 658 P.2d 1034 (1983), the court stated:

"A sheriff may exercise his powers outside the county where he holds office in only two instances: (1) where he is in 'fresh pursuit' of a person, or (2) where a request for assistance has been made by law enforcement officers from the area for which such assistance is requested. K.S.A. 22-2401a."

In the present case, the district court's ruling is based on the general application of this principle to law enforcement officers. The district court considered the circumstances in which Riley County law enforcement officers would have been authorized to pursue suspects into Geary County, and concluded:

"What we have here in fresh pursuit the officer either sees it, knows the crime is committed and pursues him, or reasonably suspects the crime has been committed. There aren't any facts in this record upon which these officers, in this Court's opinion, can reasonably suspect that a crime was committed. The burglaries weren't discovered until afterwards. Therefore, I believe that the fresh pursuit justification for a stop in—and in another jurisdiction is not applicable to this case and these officers were without jurisdiction. Officer Schuck was without jurisdiction at the time that he stopped the vehicle in Geary County."

K.S.A. 1992 Supp. 22-2402 provides in pertinent part as follows:

"Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand . . . the name [and] address of such suspect and an explanation of such suspect's actions."

K.S.A. 22-2401a provides in pertinent part as follows:

"(1) Law enforcement officers employed by consolidated county law enforcement agencies or departments and sheriffs and their deputies may exercise their powers as law enforcement officers:
(a) Anywhere within their county; and

(b) in any other place when a request for assistance has been made by law enforcement officers from that place or when in fresh pursuit of a person.

. . . .

"(6) As used in this section:

. . . .

(c) 'Fresh pursuit' means pursuit, without unnecessary delay, of a person who has committed a crime, or who is reasonably suspected of having committed a crime."

What the district court regarded as the central events for the purpose of determining the lawfulness of the stop—the suspects' stopping at a restaurant and then crossing the county line—the State treats as inconsequential. "Moot" is the term chosen by the State for describing crossing the county line, and the State falls silent on the subject of the restaurant interlude. The State argues:

"Upon the finding that the officers had reasonable suspicion to stop the cream-colored sedan . . . the fact that the vehicle was eventually stopped in Geary County becomes moot due to the fact that an officer may engage in fresh pursuit of a vehicle across jurisdictions when he has reasonable suspicion that defendants have committed a crime."

Thus, the State's theory is that the seemingly aimless business district activities of Hodges and his companions gave rise to reasonable suspicion of criminal activity because they occurred in an area plagued by recent break-ins. That reasonable suspicion of criminal activity, according to the State, was not dispelled when the men left the area of criminal activity and stopped for half an hour at a restaurant and then drove out of Manhattan. This theory glosses over both the district court's conclusion that there was no reason to suspect that a crime had been committed and the absence of statutory authority for Riley County law enforcement officers to make an extraterritorial stop without a reasonable suspicion that a crime had been committed.

The State also relies on *United States v. Sharpe,* 470 U.S. 675, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985), in which the issue was whether a 20-minute detention is too long to be reasonable under the doctrine of *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). The State argues that the district court's ruling is in conflict with *Sharpe.* The State does not elaborate on this argument, and we fail to see a conflict.

The definition of fresh pursuit in 22-2401a differs from the circumstances in which a law enforcement officer may stop a

suspect under 22-2402. A stop under 22-2402 is permitted when an officer reasonably suspects that a person (1) is committing, (2) has committed, or (3) is about to commit a crime. Fresh pursuit into a foreign jurisdiction may be based on an officer's reasonable suspicion that a person already has committed a crime, but may not be based on a reasonable suspicion that a crime is about to be committed.

Agreeing with the district court, Hodges contends that, even before the car stopped at the restaurant, Officer Sill did not have sufficient articulable facts to support a reasonable suspicion that there was a crime being committed or that one had been committed by the men. Certainly then, when the men headed out of town after stopping at the restaurant, he argues, there was no longer any statutorily permitted reason to stop them.

It seems that an argument could be made that, before the car stopped at the restaurant, it was reasonable for Officer Sill to suspect that a crime had been committed while two of the men were out of the car. The testimony established that the pattern of the business burglaries suggested that they were being committed by a person or persons on foot. There had been a rash of burglaries in the business district of Manhattan within the two-week period preceding March 3. The three men had been observed driving very slowly and without apparent destination in the business district at 10:45 p.m. when very few businesses were open. When the car stopped, two of its occupants got out but were not found in the only open business in the vicinity.

The district court concluded that those circumstances gave rise to a reasonable suspicion that a crime was about to be committed, but not that a crime had been committed. As the district court noted, at a later time burglaries were discovered to have occurred on March 3. At the time the Riley County police had the car in which Hodges was riding under surveillance, it was not known that the March 3 burglaries had been committed.

The State reviews some of this court's decisions involving stops and extracts several principles regarding reasonable suspicion from them. The State mistakes significant justifying circumstances in individual stop situations for legal requirements for stops.

First, from *State v. Potter*, 246 Kan. 119, 785 P.2d 989 (1990), the State postulates a "prior knowledge of facts" requirement.

*Potter* involved a car stop and the K.S.A. 22-2402 concept of "reasonable suspicion." After hearing the report of a convenience store robbery by two men dressed in camouflage suits and with black greasepaint on their faces, a sheriff's deputy saw a car pass through a Kwik Shop parking lot and drive through the parking lot of a small shopping center several times. 246 Kan. at 119-20.

On appeal, this court considered the Fourth Amendment constitutionality of the stop as well as whether the deputy had reasonable suspicion for the stop as required by 22-2402. 246 Kan. at 121. The district court's denial of the defendant's motions to suppress and quash the evidence was affirmed. This court seemed to find it significant that the car was observed in an area previously "subject to vandalism and other crimes," it drove through the parking lots of businesses without stopping, and the deputy "had reason to believe that the vehicle in which Potter was a passenger was not properly tagged." 246 Kan. at 122-23.

This court concluded: "Deputy Lang had reasonable suspicion pursuant to K.S.A. 22-2402. His initial stop of the vehicle was therefore valid." 246 Kan. at 124.

Second, the State cites *State v. Holthaus,* 222 Kan. 361, 564 P.2d 542 (1977); *City of Garden City v. Mesa,* 215 Kan. 674, 527 P.2d 1036 (1974); *State v. Jackson,* 213 Kan. 219, 515 P.2d 1108 (1973); and *State v. Hazelwood,* 209 Kan. 649, 498 P.2d 607 (1972). The proposition that the State takes from these cases is that "in addition to prior knowledge, the [stopping] officer must observe furtive behavior." It is the State's contention that the slow pace, low crouch, and meandering path in the present case constitute furtive behavior. The State contends:

"In the present case, a vehicle occupied by three men crouched down low in their seats, was driven slowly through a downtown business district before parking and two of the occupants exiting the vehicle, these facts alone on their face would not meet the standards of K.S.A. [22-2402] and *Terry v. Ohio.* However, when combined with the fact that 20 burglaries had been committed in a two-week period in the downtown area of Manhattan, the activity of the vehicle's three occupants clearly meets the requirement that furtive behavior was observed under *Hazelwood* and *Holthaus.*"

The State describes *Jackson* as a case in which this court suppressed evidence on the ground that "there was no evidence presented of any recent burglaries in the area, as required by

the prior knowledge of facts standard." In distinguishing *Hazelwood*, which the State had relied on, the court commented that there was no evidence of furtive behavior or police knowledge of burglaries in the area, "such as were shown by the evidence in *Hazelwood*." 213 Kan. at 223. The court also noted that "there was [no] suspicious conduct such as shown in *Terry*." 213 Kan. at 223.

The State describes *Mesa* as standing for the proposition that an officer is authorized "to stop a person loitering in a public place at 4:00 a.m., when the officer harbors a suspicion of possible burglary." Mesa was seen by patrolling officers standing in the doorway of the Motor Electric Shop. Lights were on in the shop, but the door was closed. The officers got out of their car, greeted Mesa, and asked him for identification. Mesa refused to provide any identification and walked into the shop. One of the officers caught up with him, blocked his path, and said they were going to the police station. Mesa attempted to push the officer out of the way, and he was arrested. We do not find *Mesa* to be helpful in the present case.

The State's account of the facts and conclusions from *Hazelwood* is as follows:

"In *Hazelwood*, the officers had finished investigating a couple of burglaries and were out looking for suspects when, at 4:10 a.m., they saw a man duck into an alley and get down behind some vehicles. The officers then commanded the man to come out from behind the vehicles. . . . The Court found that under the circumstances, the search and seizure was reasonable considering the early morning hour and the subject's furtive behavior and the officer's own knowledge concerning the recent commission of two burglaries in the area."

The factual circumstances in *Hazelwood* have little in common with the present case. Defendant Hazelwood was on foot at 4:10 a.m. in an area where police knew two burglaries had occurred that night, and he hid at the approach of a police car. The legal principles operating in *Hazelwood* also are dissimilar from those applicable in the present case. An individual on the street may be approached for investigative purposes whether or not the officer has reasonable suspicion of criminal activity, but a vehicle stop "always constitutes a seizure." *State v. McKeown*, 249 Kan. 506, 510, 819 P.2d 644 (1991). Thus, a vehicle stop always re-

quires the officer to have "articulable facts sufficient to constitute reasonable suspicion." 249 Kan. at 510.

The State states the holding of *Holthaus* to be that "the facts and circumstances known to the arresting officer were sufficient to warrant a man of reasonable caution to believe that an offense had been committed by the appellant." 222 Kan. at 364. The "facts and circumstances" recited by the State in its brief, however, do not include the factual key to the decision. The State recites that Holthaus had been noticed twice driving by the scene of a burglary, that he appeared nervous upon seeing a patrol car, and that he scooted down in the seat of his vehicle. The State then declares that a "fair reading" of *Holthaus* (and *Hazelwood*) "clearly indicates" that the "standards of K.S.A. [22-2402]" were satisfied by the conjunction of the recent burglary and the "harmless, but suspicious activities" of Holthaus.

In fact, there was

"no claim made by the State that when the chief of police sent the appellant to the police station there was probable cause for arrest. He was simply being detained until his story of how he came in possession of the truck could be checked out. When his story was proved untrue, he was arrested. At that time the arresting officer had the information heretofore set out, including the fact that the appellant had no authority to drive the truck." 222 Kan. at 364.

The information also included that the man who purportedly gave Holthaus permission to drive the truck knew nothing of Holthaus or, for that matter, that a car which Holthaus had mentioned was found near the burglary with its rear end damaged so as to suggest that it had been used to break down the door of the burglarized business, and that Holthaus had been seen earlier driving the car. 222 Kan. at 362. It was this compilation of information which led the court to conclude that "the facts and circumstances known to the *arresting* officer were sufficient to warrant a man of reasonable caution to believe that an offense had been committed by the appellant." 222 Kan. at 364.

*Potter, Hazelwood,* and *Holthaus* are distinguishable from the present case in that the defendant in each of the other cases was stopped in an area of known criminal activity. In the present case Hodges was not stopped until he had driven out of the particular area of Manhattan where there had been a rash of burglaries,

had made an intermediate stop at a restaurant, and had driven all the way out of town. Hodges argues that, away from an area of known criminal activity, the suspicion that a crime is about to be committed is not reasonable or certainly is not as reasonable as it might be in an area of known criminal activity.

Hodges contends that *McKeown* and the present case are quite similar. In *McKeown*, an officer was dispatched to check a vehicle parked in a rural location. The dispatch resulted from a call from a citizen. The officer "had no information which indicated any kind of criminal activity related to the car." 249 Kan. at 513-14. The driver did not act in a furtive, nervous, or suspicious manner when the officer approached. The officer testified that "the vehicle was not doing anything wrong." 249 Kan. at 514.

Hodges suggests that "[j]ust like *McKeown*, there was nothing to indicate criminal activity related to the car in which [he] was riding." Hodges' comparison is valid for the time when the car in which he was riding was stopped, but it ignores the time when the car was observed in the business district.

Hodges also relies on *State v. Epperson*, 237 Kan. 707, 703 P.2d 761 (1985). Hodges contends that the circumstances of his stop are like those in *Epperson* in that "[n]othing indicated there was a crime being committed or was about to be committed nor did the officer have any knowledge of a crime having been just committed." In *Epperson*, the stopping officer testified that at the time of the stop "he did not have any cause to believe that defendants were committing or had committed any crime." 237 Kan. at 709. The trial court found that the stop was not based on a reasonable or articulable suspicion of criminal activity, and this court agreed. 237 Kan. at 713.

When first observed by the stopping officer, Epperson and codefendant Auerbach were sitting in a legally parked car in an area where "[t]here was a problem with burglaries." 237 Kan. at 708. It was approximately 2:00 a.m. 237 Kan. at 708. When Epperson and Auerbach saw the patrol car emerge from an alley, they appeared to be startled and the passenger, Epperson, "made a quick reach to the floorboard area and then straightened back up." 237 Kan. at 708. Approximately 150 yards from where the car was parked, there was a private club which was open for business. 237 Kan. at 708. The men got out of the car and had

walked a few feet away from it when the officer stopped them. The officer entered the car, found cocaine under the passenger's seat, and arrested the men.

In concluding that the stop of Epperson and Auerbach was unlawful, this court considered the following facts:

"The officer had no knowledge of any prior crime; he had not seen or heard of any nearby break-in or other offense and had no reason to suspect these defendants of any such crime. He did not see them commit any offense. Their car was lawfully parked in an area where cars of customers of the private club frequently parked, although there were closer parking spaces available. They did not appear to be armed. The officer was suspicious but he had no objective facts upon which to form a belief that the men were involved in criminal activity. That the men appeared startled when the patrol car emerged from the alley, that the passenger appeared to reach down to the floorboard area, and that the men got out of the car and started to walk away, is not indicative of criminal activity. The officer was looking for burglary suspects. The defendants, well-dressed occupants of an expensive car, did not appear to be burglars. The officer was not looking for drug users or dealers, or at least he did not testify that he was. The defendants gave him no reason to suspect that they were users, possessors or dealers." 237 Kan. at 713.

The search of the car also was determined to be illegal. The court rejected the State's arguments that the search was justified by the violation of a municipal ordinance, that it was justified as a *Terry* search, that it was justified as an incident to a lawful arrest, and that it was justified under the plain view doctrine. 237 Kan. at 714-16. All evidence, therefore, was suppressed.

The State would distinguish *Epperson* from the present case on the ground that the officer who stopped Epperson and Auerbach was looking for burglars, but found drug offenders. In the present case the officer was looking for burglars and found them. The State does not explain how or why this distinction is significant.

If there was reasonable suspicion that the men committed a burglary or burglaries while they were in the business district of Manhattan, 22-2401a(1) would authorize the stop in Geary County as long as it was made "without unnecessary delay." In this regard, the State makes this policy argument:

"Police officers are encouraged, under the holding of the trial court, to make determinations of reasonable suspicions more hastily. Instead of waiting to make additional observations to confirm or dispel suspicions of possible

furtive behavior, law enforcement officers in the State of Kansas will be compelled to seize individuals at the moment they become suspicious for fear that failure to do so has the effect of losing what they have already gained, reasonable suspicion. . . . The holding of the trial court will have a net result—not of decreasing unnecessary seizures of persons but instead—of increasing seizures of persons unnecessarily because of the officers' fear that they must stop now or maybe never, a policy inconsistent with the spirit of the Fourth Amendment."

The parties do not delve any further into the question of "without unnecessary delay."

Most recently the requirements of fresh pursuit have been considered by the Court of Appeals. In *City of Prairie Village v. Eddy,* 14 Kan. App. 2d 661, 798 P.2d 66 (1990), Eddy was arrested in Overland Park by a Prairie Village police officer. He was charged with driving while under the influence of alcohol. The officer observed Eddy, while in Prairie Village, make a complete stop at a green light and then make a right turn without signalling. The officer followed Eddy and stopped him for violation of the municipal turn indicator ordinance. The Court of Appeals concluded that this was "fresh pursuit" because "the officer's pursuit of the vehicle was continuous and without delay." 14 Kan. App. 2d at 663.

Although the facts are dissimilar compared to the circumstances in *Eddy,* the pursuit in the present case is interrupted rather than continuous and protracted rather than without delay. If the officers' action constituted pursuit, it was at best a very stale pursuit. The district court's finding that the officers, Sill and Schuck, were not in "fresh pursuit" is correct.

Had Officer Sill stopped the vehicle in Manhattan after making his observation of the vehicle and its occupants, the stop may have been justified. However, the stop of the automobile in Geary County was not justified. There is substantial competent evidence in the record that the stop was not made "without unnecessary delay." The officers were not in fresh pursuit of the vehicle, nor were they in Geary County at the request of any Geary County law enforcement officer. Thus, regardless of whether officers had reason to suspect that a crime had been committed, K.S.A. 22-2401a(1) does not authorize Riley County police officers to exercise their power as police officers in Geary County. The district court correctly found that the Riley County officers acted beyond their

power in stopping the vehicle in Geary County, and therefore the stop was unlawful.

The State next argues that Hodges does not have standing to seek suppression of the evidence seized in the search of the automobile and of the confession of Lankster.

The following testimony was given by Officer Sill at the preliminary hearing:

"Q. Did you search the vehicle?

"A. Yes, I did.

"Q. Now, did you have consent to search that vehicle?

"A. Yes. I asked Mr. Boykins if—if he would allow me to search the vehicle. And he told me sure, go ahead, it's not his vehicle.

"And I said but you are in control of the vehicle? And he said yeah. And I asked him again if I could search it and he said sure. So, at that time he handed me the keys to the vehicle."

The search of the car disclosed burglary tools, a glass vial with a burned residue in it, and a large sum of money wrapped in a jacket on the floorboard.

With regard to the evidence which was found in the car, the State concedes that this court's ruling in *Epperson* gives Hodges standing to seek suppression. The State asks that the decision in *Epperson* be reversed. The State contends that the decision in *Epperson* stems from "an improper analysis of Fourth Amendment Rights" and directs the court's attention to *Rakas v. Illinois*, 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978), *reh. denied* 439 U.S. 1122 (1979), and *Alderman v. United States*, 394 U.S. 165, 22 L. Ed. 2d 176, 89 S. Ct. 961 (1969), for the proper analysis.

In *Epperson*, there was no evidence that defendant claimed a possessory interest in the cocaine. Nonetheless, the court concluded that the cocaine was not admissible as against Epperson. The court stated: "Epperson's right to challenge the search stems not from the fact that he was previously a passenger in the motor vehicle, but because he is a person who was unlawfully stopped and seized, and because the search followed as a consequence thereof." 237 Kan. at 718.

The court analogized to cases holding that, where the car and its occupants were improperly stopped, a passenger has standing to challenge a search of a motor vehicle. 237 Kan. at 717-18. The

cases cited were: *United States v. Santia-Manriquez,* 603 F.2d 575 (5th Cir. 1979); *State v. Hocker,* 113 Ariz. 450, 556 P.2d 784 (1976); *People v. Kunath,* 99 Ill. App. 3d 201, 425 N.E.2d 486 (1981); and *State v. Scott,* 59 Or. App. 220, 650 P.2d 985 (1982), *appeal after remand* 68 Or. App. 386, 681 P.2d 1188 (1984). All but the Arizona case were decided after *Rakas,* and, of course, *Epperson* was decided after *Rakas.*

Further, the present case is distinguishable from *Rakas* in that the car stop in Geary County was unlawful. There was no issue of probable cause or the legitimacy of the stop in *Rakas.* 439 U.S. at 130. The following language demonstrates that the Supreme Court was not concerned with the legality of the stop: "Because we are not here concerned with the issue of probable cause, a brief description of the events leading to the search of the automobile will suffice." 439 U.S. at 130. An officer who had received a radio call stopped the car in which Rakas rode as a passenger because it matched the description of a robbery getaway car. 439 U.S. at 130. The occupants of the car were ordered out and the car was searched. During the search a box of rifle shells was discovered in the locked glove compartment, and a rifle was found under the front passenger seat. 439 U.S. at 130. Rakas moved to suppress the rifle and shells on the ground that the search violated his Fourth and Fourteenth Amendment rights. He had neither an ownership nor a possessory interest in the car or in the rifle and shells. The United States Supreme Court concluded that he had no right to challenge the search. We find no reason to depart from our decision in *Epperson.*

The State's argument with regard to Hodges' standing to seek suppression of the confession of Lankster is that the principle of *Rakas* and *Alderman* controls and that the district court's focus on *United States v. Ceccolini,* 435 U.S. 268, 55 L. Ed. 2d 268, 98 S. Ct. 1054 (1978), was misdirected. The *Rakas* and *Alderman* principle relied on by the State is that a defendant may not "vicariously assert Fourth Amendment rights" of another. According to the State, the error in the district court's reliance on *Ceccolini* is that the court's analysis is limited to the issue of attenuation when it should have been focused on the issue of standing. Thus, the argument continues, the district court failed

to determine whether Hodges "had a substantive Fourth Amendment right violated."

In *Ceccolini* the Supreme Court reaffirmed its holding in *Wong Sun v. United States,* 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963), that " 'verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the "fruit" of official illegality than the more common tangible fruits of the unwarranted intrusion.' " 435 U.S. at 275 (quoting 371 U.S. at 485). It also added these caveats:

"Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet. Witnesses can, and often do, come forward and offer evidence entirely of their own volition. And evaluated properly, the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence." 435 U.S. at 276-77.

"[T]he exclusionary rule should be invoked with much greater reluctance where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support suppression of an inanimate object." 435 U.S. at 280.

Ceccolini was charged with perjury for denying that he was aware of or was involved in gambling operations. Long before the charge was filed, an illegal search had occurred. A policeman on break went into Ceccolini's flower shop to chat with Hennessey, an employee. Dawdling behind the counter, the officer picked up an envelope, examined its contents, and discovered that it contained money and policy slips. In response to the officer's questions, Hennessey told him that the envelope belonged to Ceccolini and that he had instructed her to give it to someone else. 435 U.S. at 270.

The police officer told detectives of the envelope, and they told an FBI agent. As a result, Ceccolini was investigated and denied knowledge or involvement. At Ceccolini's bench trial for perjury, Hennessey testified for the government, but the district court granted defendant's motion to suppress the testimony. The Court of Appeals affirmed. The Supreme Court reversed.

The State's argument is that the cardinal issue is standing and that the district court's reliance on *Ceccolini,* which does not involve a question of Ceccolini's right to seek suppression of Hennessey's testimony, is misplaced. It does not appear from the

district court's journal entry whether consideration was given to the issue of standing. The district court's citation of *Ceccolini* is for the proposition that "the live testimony of a witness can be subject to suppression as fruit of the poisonous tree." Even though the State concedes that under *Epperson* Hodges has a right to seek suppression of the physical evidence seized during the search of the car, the State argues *Epperson* does not give Hodges a right to seek suppression of Lankster's confession because the right is "personal to Robert Lankster."

The State's argument is misguided because the district court excluded Lankster's confession as being too firmly connected to the illegal car stop. Hodges was subject to the illegal car stop and is arguing that the confession is a fruit of the poisonous tree. If the State's argument is that Lankster's confession, as a matter of law, should be subjected to an analysis different from the analysis applied to the physical evidence, then in *Ceccolini* the Supreme Court rejected this argument. Moreover, the cases relied on by the State, *Rakas* and *Alderman*, both involve physical evidence. We find no merit in the State's argument and conclude the defendant had standing to seek suppression of Lankster's confession.

Finally, the State argues the district court erred in suppressing Lankster's confession. The State asserts that "[i]t is clear error when the trial court finds the State did nothing wrong as it relates to Lankster and then suppress[es] Lankster's confession from being used against defendant Hodges." The district court did not consider the post-arrest conduct of the police or the prosecutor to have been improper or to have induced Lankster's confession. The district court did consider the car stop to have been improper. In the district court's view there was an unbroken chain of causation linking the confession to the illegal stop. For this reason, the district court's finding, that there were no additional illegalities following the stop, did not affect its determination that the confession should be suppressed as fruit of the poisonous tree.

The State relies on *State v. Knapp*, 234 Kan. 170, 671 P.2d 520 (1983), and *State v. Kirby*, 12 Kan. App. 2d 346, 744 P.2d 146 (1987), *aff'd* 242 Kan. 803, 751 P.2d 1041 (1988). The proposition the State draws from *Knapp* and *Kirby* is that the inquiry

must be whether the evidence came to light as a result of exploitation of illegal law enforcement activity, not simply whether it would have come to light but for illegal law enforcement activity. This principle was stated as follows in *Wong Sun:*

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." 371 U.S. at 487-88.

This court, in *State v. Knapp,* 234 Kan. 170, considered the admissibility of physical evidence and statements by the defendant obtained after he was illegally arrested.

Knapp, a staff sergeant in the Army, was placed in a detention cell at a military police station overnight before being questioned by Kansas authorities in connection with the deaths of his former wife and her neighbor. The district court determined that this initial arrest was without probable cause. Nonetheless, Knapp's extrajudicial statement and evidence which was found pursuant to his consent to search was admitted at trial. The district court concluded that the statement and the consent were freely, voluntarily, and knowingly given, and, therefore, Knapp's Fifth Amendment rights had not been violated. This court agreed.

The district court also concluded that Knapp's Fourth Amendment rights were intact because the causal connection between his illegal arrest and his giving the statement and the search consent had been broken by his intervening acts of free will. Those acts include the following: Knapp was advised of his *Miranda* rights. He read the rights form, altered it to his satisfaction, and signed it. Knapp gave a written statement; he gave verbal and written consents to searches of his quarters and car. The written consent was a form, which he studied and modified. He specified when the searches would take place. When "gaps" in his written statement were pointed out, Knapp agreed to give a detailed account of his recent activities and insisted on doing so immediately.

This court agreed with the district court's conclusion as to the Fourth Amendment rights. The court stated: "The trial court's

finding that there was sufficient attenuation between the illegal arrest and the obtaining of the statements and consents to search to make the statements and evidence admissible is supported by substantial competent evidence and will not be disturbed on appeal." 234 Kan. at 178. The proper inquiry was described as follows:

"In determining whether evidence obtained after an illegal arrest is sufficiently separated from the initial illegal police activity and is the result of the free will of the defendant, no single factor is controlling. Factors to be considered include (1) whether *Miranda* warnings were given; (2) the temporal proximity of the illegal arrest and the statement, confession, or consent to search; (3) the purpose and flagrancy of the officer's misconduct; and (4) other intervening circumstances." 234 Kan. 170, Syl. ¶ 3.

In *Kirby*, the Court of Appeals concluded that there was substantial evidence that the initial stop was based on a reasonable and articulable suspicion of criminal activity. 12 Kan. App. 2d at 354. The officer "stated the stop was based upon his knowledge of deer poaching in the area, the early morning hour, the fact the truck headlights were off and the domelight was on, a tarp was covering something on the truck bed, and the absence of a license tag." 12 Kan. App. 2d at 353.

After stopping the truck, the officer removed the tarp that was over items in the bed of the truck, removed items which were under the tarp, and ran the serial numbers of the items through police computers to see whether any had been reported stolen. The Court of Appeals concluded that the search was illegal. 12 Kan. App. 2d at 355.

Kirby and the passenger were not taken into custody. Five days later, Kirby contacted the police department about recovering his truck. As instructed, Kirby went to the police station and met with a detective, who read the *Miranda* warnings before questioning Kirby. Kirby implicated himself in a burglary and signed a statement to that effect.

The Court of Appeals used the analysis of *Knapp*, but its opinion makes clear that it was aware that the analysis had been formulated for determining whether evidence obtained following an illegal arrest was admissible. The Court of Appeals stated:

"Although the Supreme Court has not directly addressed a case involving a confession following an *illegal search*, other courts have considered the

factors set forth in *Knapp* in illegal search cases. *Wilkerson v. United States,* 432 A.2d 730 (D.C. 1981); *People v. Robbins,* 54 Ill. App. 3d 298, 369 N.E.2d 577 (1977). See *Childers,* 222 Kan. 32 (statement following illegal search not excluded because not triggered or induced by illegal search)." 12 Kan. App. 2d at 357.

In following the *Knapp* analysis, the Court of Appeals found that the *Miranda* warnings were given to Kirby, that the five days between the search and the confession "weigh[ed] in favor of attenuation," that there was no evidence of bad faith on the part of law enforcement officers, and that other intervening circumstances indicate that Kirby was exercising his free will rather than succumbing to exploitation. 12 Kan. App. 2d at 357-58. The questions considered by the Court of Appeals with regard to the fourth factor, other intervening circumstances, were whether Kirby's contacting the police about recovering his truck was an act of free will and whether the confession was the result of the detective's confronting Kirby with the illegally seized evidence. 12 Kan. App. 2d at 358. The Court of Appeals found that Kirby's initiative was an act of free will which purged the taint of the illegal search and that there was no evidence that Kirby had been confronted with the illegally seized evidence. Thus, the Court of Appeals concluded that the district court's admission of the confession was supported by substantial evidence. 12 Kan. App. 2d at 359.

Applying the analysis of *Knapp* and *Kirby* to Lankster's confession: (1) *Miranda* warnings were given to Lankster. (2) The illegal stop of the car occurred probably shortly before midnight on March 3, and by midafternoon on March 4, Lankster had set the wheels in motion for giving his confession. (3) It does not appear that the officers' conduct may be characterized as flagrant misconduct. Their purpose in stopping the car later rather than sooner was a desire to "catch them in the act of committing a crime." Their purpose in stopping the car once it became apparent that its occupants were leaving town rather than engaging in criminal activity is not clear, but appears to have been based on a suspicion that a crime had been committed by the car's occupants. (4) Other intervening circumstances briefed by the State mirror the circumstances discussed in *Kirby.* First, the State cites Lankster's initiating contact with the police for the purpose

of making a deal which would benefit him. Second, the State asserts that there is no evidence in the record that Lankster was confronted with seized evidence. We therefore conclude that the district court's suppression of Lankster's confession was not supported by substantial competent evidence.

The judgment of the district court is affirmed in part and reversed in part, and the case is remanded with directions to reinstate the complaints.