No. 54,979

STATE OF KANSAS, *Appellee,* v. THEODORE C. KNAPP, *Appellant.*

(671 P.2d 520)

Opinion filed October 21, 1983.

*Mark Krusor,* of Mathews, Taylor & Krusor, of Winfield, argued the cause and was on the brief for appellant.

*C. Douglas Wright,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

HOLMES, J.: Theodore C. Knapp appeals from his conviction by a jury of two counts of first-degree murder (K.S.A. 21-3401) in the slaying of his ex-wife and her next-door neighbor.

Defendant and Connie Sue Knapp were divorced in the District Court of Cowley County on August 5, 1981. As part of the decree, Connie Sue was awarded possession of a 1976 Volkswagen Dasher automobile, which her husband was to pick up and deliver to her. Defendant was then to take possession of a 1979 Jeep held by Connie Sue. Defendant at the time was a staff sergeant in the Army stationed at Fort Huachuca, Arizona. On September 23, 1981, he was granted temporary leave to pick up the Volkswagen in New Orleans, Louisiana, where it had arrived after being shipped from defendant's prior duty station in West Germany. Connie Sue was expecting her ex-husband to arrive on September 24, 1981, to exchange cars with her.

On the night of September 24, 1981, Winfield police officers were dispatched to the home of Connie Sue Knapp following the report of a domestic disturbance. Upon entering the residence they discovered the bodies of Connie Sue Knapp and her neighbor Jacqueline Musgrave. Both had been brutally stabbed numerous times and, in addition, Musgrave had been shot once with a 9mm weapon. Because of the recent divorce, Winfield police and KBI agents immediately attempted to locate defendant. Upon contacting Fort Huachuca they were advised defendant was in transit between New Orleans and the army post. The Kansas authorities then sent a teletyped regional broadcast to law enforcement agencies stating they were attempting to locate

defendant for questioning in a double homicide. The attempt to locate notice was also sent to the authorities at Fort Huachuca.

Sgt. Phillip Whitehead, of the army military police, located Knapp at the fort on September 26, 1981. Whitehead advised Knapp he was wanted for questioning by Kansas authorities and asked if Knapp would proceed to the military police station on the post. Defendant did so willingly and, other than the initial contact, the military police had no conversation with Knapp other than to make him comfortable in the station. Special Agent George Fifer of the Army Criminal Investigation Command was contacted and advised that Knapp had been located.

Fifer then had a telephone conversation with an agent of the Kansas Bureau of Investigation, who informed Fifer of the following: (1) That a double homicide had occurred in which Knapp's ex-wife and a next-door neighbor were killed in Winfield, Kansas; (2) that Knapp had picked up a Volkswagen Dasher from New Orleans, Louisiana, on September 23, 1981; (3) that the homicides occurred on September 24, 1981; (4) that a Kansas court had ordered Knapp to take the Volkswagen to Winfield to exchange it for the Jeep that Knapp's ex-wife had in her possession; (5) that both women were stabbed to death with what was estimated to be a 7 - 7 ½ inch bladed knife; (6) that Musgrave was also shot with what appeared to be a 9mm weapon; and (7) that Knapp owned a 9mm weapon. The KBI agent stated they wanted to interview Knapp, but couldn't reach Fort Huachuca until the next day, September 27th, and asked if Knapp would be available for questioning at that time. Fifer told the KBI agent he would have to check with the army legal advisors to determine whether Knapp could be held for their arrival.

Agent Fifer then contacted an Army Staff Judge Advocate and presented him with the above facts, and that Knapp was on permissive temporary leave to pick up the Volkswagen, and the further information that the Knapps' divorce had not been amicable. Fifer indicated he felt he had reasonable belief to detain Knapp for twenty-four hours under Army regulations, and asked the Staff Judge Advocate whether he was legally correct. After some research on the question, the judge advocate called Fifer to advise him there was reasonable belief to detain Knapp for questioning by Kansas authorities on the following day. Kansas officials were notified accordingly, and Knapp was placed in a detention cell at the military police station overnight.

On September 27 a KBI agent and a Winfield police officer arrived at Fort Huachuca and met with Sgt. Knapp in the presence of Agent Fifer. Defendant was advised of his *Miranda* rights at the outset of this meeting and again after being given an explanation of the officers' purpose. A waiver of rights form was presented and read to the defendant, who eliminated that portion of the form which stated he was willing to answer questions, and he then signed the form. Defendant stated he was willing to give a written statement detailing his trip to New Orleans to pick up the car and he did so. Knapp also gave both verbal and written consents to searches of his barracks room and the Volkswagen automobile, although he carefully studied and modified the written consent form to exclude certain items originally included stating he didn't want the authorities looking at his personal papers. Defendant dictated to the officers when the searches should take place. During the meeting Knapp was cooperative but insisted everything be done on a "one-time basis," saying "whatever you've got to do, make sure you do it now and get it over with." Knapp was taken to his quarters for the search, and the following items were seized: a diving knife, a butcher knife, a jumpsuit, a shirt, and a pair of boots, none of which were presented at trial. The car search followed, during which the officers obtained a shoe print lifted from the front bumper, the odometer reading, a floor mat, and a box of 9mm Remington center-fire cartridges. Later, additional physical evidence was recovered from the automobile after search warrants had been obtained from Cochise County, Arizona, civil authorities and from Fort Huachuca military authorities.

After the initial searches, the group returned to Agent Fifer's office where the Kansas authorities pointed out "large gaps" in defendant's written statement and inquired whether defendant would reconsider discussing his activities. Knapp acquiesced and insisted the inquiry proceed immediately. KBI Agent Green reminded defendant of his earlier indication he did not wish to answer questions but Knapp agreed to give a detailed accounting of his trip from New Orleans without expressing any dissatisfaction or desire to avoid the questioning. After the defendant had narrated his activities during the previous four days, Green suggested it was time for the interview to stop and the officers could contact him later if the need arose. Knapp responded that if

the officers had further need of his cooperation or assistance for questions or anything else, he wanted it done at that time rather than in the future. Green indicated he desired a set of fingerprints and hair samples, but specifically advised Knapp that he did not have to supply this material to the officers. Knapp insisted the evidence sought be obtained at that time, and assisted the officers in their efforts. The written and oral statements given by Knapp were exculpatory in nature and did not involve any confession or admission of any connection with the two murders. Defendant denied having been in Winfield, Kansas, on September 24, 1981.

Upon the officers' return to Kansas, they obtained a warrant for Knapp's arrest on the basis of the accumulated information. He was brought to trial in April, 1982, and was convicted by a jury of two counts of first-degree murder. He now appeals those convictions.

Defendant's first point on appeal is that the trial court committed error in admitting into evidence the statements and some of the physical evidence obtained during the questioning and searches which took place at Fort Huachuca. He contends his initial arrest by Sgt. Whitehead was without probable cause, or its military equivalent of reasonable belief, and therefore all of the evidence obtained thereafter was inadmissible under the doctrine of fruit of the poisonous tree as enunciated in *Nardone v. United States*, 308 U.S. 338, 84 L.Ed. 307, 60 S.Ct. 266 (1939), and *Wong Sun v. United States*, 371 U.S. 471, 9 L.Ed.2d 441, 83 S.Ct. 407 (1963). The trial court held an extensive evidentiary hearing on defendant's motion to suppress the statements and evidence and in a lengthy and scholarly written opinion found that the defendant's original restraint amounted to an arrest without probable cause but that the taint of the unlawful arrest was dissipated by subsequent events and the evidence was admissible. We agree with the trial court's conclusion that the evidence was admissible.

It appears clear that an apprehension under the Uniform Code of Military Justice is essentially the same as an arrest under the general criminal law. The trial court, in its opinion, stated:

"There was no question that in the circumstances described in Sgt. Whitehead's testimony, the defendant was subject to the control and direction of Sgt. Whitehead and not free to exercise choice as to whether he would accompany him to the military police station, although Whitehead testified that he only

asked the defendant if he would precede him. Whitehead's testimony was that if the defendant had asked, Whitehead would not have let him go until he had contacted the desk sergeant.

". . . It is not seriously contended by the State that the information Whitehead possessed at the time he encountered defendant was sufficient to constitute probable cause."

Accepting the trial court's determination that the initial arrest of Knapp was without probable cause and therefore a violation of his Fourth Amendment rights under the United States Constitution, it remains to be determined whether the statements and evidence were admissible in evidence irrespective of that violation and whether the statements and consents to search were voluntary under the requirements of the Fifth Amendment. In an analysis of defendant's contentions that both his Fifth Amendment and Fourth Amendment rights were violated, it is necessary that we first look to the allegations that the statements and consents to search were not freely, voluntarily and knowingly given. In *State v. Kanive*, 221 Kan. 34, Syl. ¶ 5, 558 P.2d 1075 (1976), we held:

"When a trial court conducts a full pre-trial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely, voluntarily and knowingly given and admits the statement into evidence at the trial, the appellate court should accept that determination if it is supported by substantial competent evidence."

In the instant case it is abundantly clear that the statements and consents to search were freely, voluntarily and knowingly given. Following defendant's apprehension by Sgt. Whitehead the military authorities made no attempt to interrogate or question Knapp. They made no attempt to conduct any search of defendant, his quarters or his automobile and merely detained him until the Kansas officers arrived. The Kansas officers were meticulous in giving Knapp his *Miranda* rights and in following Knapp's directions as to how he was willing to proceed. Knapp made changes in the *Miranda* rights form, at first indicating he would not submit to questioning but would submit a written statement of his activities from the time he left New Orleans with the Volkswagen automobile until he arrived back at Fort Huachuca. Later he changed his mind, without any coercion, promises or threats and gave oral information to the officers. Knapp also made changes in the consent to search his quarters and automobile. He imposed certain limitations upon the items to be

included in the search, accompanied the officers during the searches, cooperated with the officers and at all times insisted that the entire investigation be completed immediately and at one time. It is obvious that he understood his rights, and asserted them as he saw fit, and that the statements and the consents to search were freely, voluntarily and knowingly given to the Kansas officers. We find no Fifth Amendment violations of the defendant's constitutional rights.

Having determined as a threshold matter that defendant's Fifth Amendment rights were not violated, we must next determine whether the illegal arrest so tainted the statements and physical evidence that the same was inadmissible under the Fourth Amendment and the fruit of the poisonous tree doctrine. In determining whether the taking of the statements and the recovery of the physical evidence is sufficiently divorced from the taint of the original illegal arrest or detention, the test to be applied is similar to that used in the determination of Fifth Amendment violations. That is, when a trial court conducts a full pretrial hearing on the admission of statements and other evidence obtained following an illegal arrest and determines that the initial taint of the illegal arrest has been sufficiently purged or diluted and admits the evidence at trial, this court, on appeal, should accept that determination if it is supported by substantial competent evidence. In *Wong Sun*, the Supreme Court said:

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." 371 U.S. at 487-88.

Since *Wong Sun* recognized that evidence might be "sufficiently an act of free will to purge the primary taint of the unlawful invasion" it becomes necessary to determine what is necessary to dissipate the taint and whether sufficient dissipation was shown in the instant case. In *Brown v. Illinois*, 422 U.S. 590, 45 L.Ed.2d 416, 95 S.Ct. 2254 (1975), the court was faced with a ruling of the Illinois Supreme Court which held that the giving of *Miranda* warnings " 'served to break the causal connection between the illegal arrest and the giving of the

statements, and that defendant's act in making the statements was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." [Citing *Wong Sun*.]' " 422 U.S. at 597. The court said:

"While we therefore reject the *per se* rule which the Illinois courts appear to have accepted, we also decline to adopt any alternative *per se* or 'but for' rule. The petitioner himself professes not to demand so much. Tr. of Oral Arg. 12, 45, 47. The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, see *Johnson v. Louisiana*, 406 U.S. 356, 365 (1972), and, particularly, the purpose and flagrancy of the official misconduct are all relevant." pp. 603-04.

The trial court in the instant case then went on to analyze numerous federal cases and the evidence in this case and held:

"Making the inquiry prescribed by *Wong Sun*—whether the evidence to which objection is made has been come at by exploitation of the primary illegality of police action—and keeping in sharp focus the deterrent purpose of the Fourth Amendment exclusionary rule, as enjoined by Justice Powell in *Brown,* the Court concludes that, on all of the circumstances, there was an attenuation of the chain of causation between the illegal arrest of the defendant and his subsequent statement and consent to search, as a result of which the physical evidence sought to be suppressed was obtained, which permits the admission of the statement and evidence as having been purged of the primary taint of the illegal arrest. There is much more here than the simple giving of *Miranda* warnings, which were held insufficient to dissipate the taint of illegal arrest in *Brown v. Illinois.* The other factors identified in *Brown* as determinative of whether evidence is obtained by exploitation of an illegal arrest weigh, in the aggregate, in favor of admissibility. In addition to meeting the Fifth Amendment standard of voluntariness, defendant's conduct in making a written statement and executing a consent to search is found to be 'sufficiently an act of free will to purge the primary taint.' "

We agree with the trial court. Here the Kansas officers had no part in the illegal arrest of defendant and did not seek such an arrest. Defendant was not coerced in any manner, he voluntarily cooperated with the officers and dictated the terms of his statements, interrogation and the searches. He was fully advised of his rights and understood them. He acknowledged an obligation to assist in the investigation. Finally, the military personnel were acting in complete good faith in their belief that they were

acting properly under military procedure. Their actions were sanctioned by the staff judge advocate's office and no ulterior motive on their part is evident. As stated by Justice Powell in his partial concurrence in *Brown:*

"The basic purpose of the rule, briefly stated, is to remove possible motivations for illegal arrests. Given this purpose the notion of voluntariness has practical value in deciding whether the rule should apply to statements removed from the immediate circumstances of the illegal arrest. If an illegal arrest merely provides the occasion of initial contact between the police and the accused, and because of time or other intervening factors the accused's eventual statement is the product of his own reflection and free will, application of the exclusionary rule can serve little purpose: the police normally will not make an illegal arrest in the hope of eventually obtaining such a truly volunteered statement." 422 U.S. at 610.

The trial court's finding that there was sufficient attenuation between the illegal arrest and the obtaining of the statements and consents to search to make the statements and evidence admissible is supported by substantial competent evidence and will not be disturbed on appeal.

Defendant's next point on appeal is claimed error in the trial court's admission into evidence of portions of his deceased wife's testimony from the divorce trial and a police officer's testimony of an earlier break-in at the victim's residence. It is contended the testimony of Connie Sue Knapp from the divorce trial constitutes inadmissible hearsay under K.S.A. 60-460. We find no merit in this contention. The portion of the testimony of Connie Sue meets all the requirements of K.S.A. 60-460(c) and is therefore admissible. Defendant also asserts that the testimony, if admissible, and which could be construed to be in the nature of a prior threat, required a limiting instruction under K.S.A. 60-455. In *State v. Wood,* 230 Kan. 477, 638 P.2d 908 (1982), we held that in cases of marital homicide evidence of a discordant marital relationship was admissible independent of K.S.A. 60-455. The same case controls the admissibility of the police officer's testimony that the victim had told him the defendant broke into her house on August 4, 1981, the day before the divorce. Defendant's arguments lack merit.

Next the defendant objects to certain proceedings which transpired during the trial outside the defendant's presence which involved the jury and a member thereof. During Knapp's trial a juror named Manske contacted the bailiff and indicated she thought she had independent knowledge of the case. Her

brother had been questioned by the Winfield police during their investigation because he owned a sports car similar to one observed near the scene of the crime the night the two women were killed. At trial one of the State's witnesses testified on cross-examination that he heard a vehicle come onto the street in front of Connie Sue's home and accelerate rapidly. Since Juror Manske had not previously mentioned during voir dire that her brother had been questioned, she felt that after this testimony her information should be brought to the attention of the court. A conference in the judge's chambers was held, attended by the judge, the juror, and counsel for both parties. Defendant was not advised and was not present. At this conference the judge inquired as to what effect this information had on the juror's mind. Both counsel were given an opportunity to inquire of the juror, and after she was excused from the judge's chambers, the decision was made not to remove her from the jury. Knapp's counsel wanted her left on the jury as he felt she would be a good juror for the defense. Knapp now claims prejudicial error occurred in this proceeding and decision made outside his presence.

K.S.A. 22-3405(1) states:

"*The defendant in a felony case shall be present* at the arraignment, *at every stage of the trial including the impaneling of the jury* and the return of the verdict, and at the imposition of sentence, except as otherwise provided by law. In prosecutions for crimes not punishable by death, the defendant's voluntary absence after trial has been commenced in his presence shall not prevent continuing the trial to and including the return of the verdict." (Emphasis added.)

It is defendant's contention that this conference with the juror amounted to an extension of the voir dire examination and that his statutory and constitutional rights to be present were violated. See *State v. Antwine*, 4 Kan. App. 2d 389, 607 P.2d 519 (1980). The State readily concedes that the trial court erred in proceeding in violation of K.S.A. 22-3405. It argues, however, that the appropriate question on appeal is whether Knapp's presence at this conference was essential to a fair and just determination of a substantial issue and points to the fact that defense counsel was present, qualified, and did make the relevant determination to keep Manske on the jury. See *State v. Mantz*, 222 Kan. 453, 565 P.2d 612 (1977). K.S.A. 22-3405 provides that a defendant in a felony case shall be present "at

every stage of the trial." We have construed this section of the statute to require defendant's presence at all times when the jury is present or at other proceedings where defendant's presence is essential to a fair and just determination of a substantial issue. *State v. Sanders,* 227 Kan. 892, 610 P.2d 633 (1980); *State v. Mantz,* 222 Kan. at 463; *State v. Sandstrom,* 225 Kan. 717, 595 P.2d 324, *cert. denied* 444 U.S. 942 (1979). Where an in-chambers conference concerns only questions of law an accused's presence is not crucial and he is not thereby prejudiced by his absence. *State v. Sanders,* 227 Kan. at 894. The failure to have defendant present at the conference was a clear violation of the statute. A defendant has a constitutional right to a fair trial and the failure of defendant to be present at crucial stages of the trial is also a violation of that constitutional right. However, as will be shown later, the violation does not constitute reversible error.

Defendant also asserts the trial court committed error in instructing the jury outside the presence of the defendant. K.S.A. 22-3420(3) provides:

"After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where the information on the point of law shall be given, or the evidence shall be read or exhibited to them *in the presence of the defendant,* unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney." (Emphasis added.)

During deliberations the jury sent a communication to the trial judge seeking clarification of instruction No. 13, ¶ 3. The question was delivered to the judge and counsel in chambers, out of defendant's presence, where an answer was formulated by the judge, approved by counsel for both sides, and sent back to the jury. The relevant communications were:

*Instruction No. 13,* ¶ *3:* "When there is doubt as to which of two or more offenses defendant is guilty, he may be convicted of the lesser offense only."
*Jury Question:* "Is this considered on an individual basis or the jury as a whole?"
*Court's Answer:* "Your agreement upon a verdict must be unanimous as you have been instructed in the last line of Instruction No. 14."

The State concedes, once again, that the trial court violated the statute by answering the jury outside defendant's presence. However, the State argues that this error is not prejudicial to the point of requiring reversal, because defendant's counsel was present, and the answer proposed by the court and approved by

counsel contained no new instructions. We agree that K.S.A. 22-3420 was violated by the trial court but again find no reversible error.

The evidence of defendant's guilt was overwhelming. It will be reviewed only briefly to show the basis of our decision. Defendant, in his statements to the Kansas officers at Fort Huachuca, denied any knowledge of the murders of his ex-wife and Jacqueline Musgrave and contended he had returned to Arizona from New Orleans on a direct route on Highway 10 through southern Texas and New Mexico. At trial a completely different set of facts developed. It was shown that defendant purchased motor oil in Richardson, Texas, some 250 miles north of his reported course of travel. There was considerable evidence of the marital discord which existed between defendant and Connie Sue Knapp. Defendant's roommate testified as to the marital problems, as related to him by the defendant, and also testified that when defendant returned with the Volkswagen automobile, he stated it looked like he would be getting his children sooner than he had anticipated. Williamson also testified defendant intended to pick up the Jeep vehicle from his ex-wife on the 23rd of September, 1981. It was established that the odometer on the Volkswagen registered 90,313 miles when picked up from Naval authorities on September 23, 1981. When the vehicle was examined by Kansas police authorities at Fort Huachuca on September 27, 1981, the odometer registered 92,405 miles, or a difference of 2,092 miles. The distance from New Orleans to Fort Huachuca by the route claimed by defendant is 1,460 miles while the distance by way of Winfield, Kansas, is 1,928 miles.

The bullet which passed through the body of Musgrave was fired from defendant's 9mm pistol. The search of defendant's automobile disclosed a box of 9mm cartridges. Both victims were killed by repeated savage stabbing attacks with wounds to the chest, lungs, heart and great vessels. Defendant's sister testified as to the marital strife between defendant and Connie Sue and stated defendant had threatened to kill his wife. Another sister of defendant testified to similar threats. Perhaps the most damaging testimony was that of KBI experts that a bloody handprint of the defendant was found on the wall of Connie Sue's apartment and the blood matched that of a mixture of both victims. Blood was

found on the floor mat of the car and on the trunk lid. In the face of all this evidence, the defendant testified to a completely different story than the one originally given the Kansas police in Arizona. He admitted he had gone to Winfield to deliver the car but on his arrival found his ex-wife lying on the floor in a pool of blood. He tried to render assistance to her but was unable to do so. He then discovered the body of Jacqueline Musgrave in the dining room and, after doing so, left and proceeded to Arizona. Numerous elements of his testimony were shown to be untrue or physically impossible. There were no other witnesses for the defense.

Assuming that the errors of the trial court in questioning one juror and answering the jury's question outside the presence of the defendant amounted to errors of constitutional magnitude, we have no hesitancy based upon this record in finding beyond any reasonable doubt that such errors had little, if any, likelihood of changing the results of the trial. *Chapman v. California,* 386 U.S. 18, 17 L.Ed.2d 705, 87 S.Ct. 824, *reh. denied* 386 U.S. 987 (1967); *State v. Thompson,* 221 Kan. 176, 558 P.2d 93 (1976); *State v. Fleury,* 203 Kan. 888, 457 P.2d 44 (1969). Defendant's points relative to the court's communications with the jury are not sufficient to constitute reversible error.

The fourth issue raised by appellant is that the trial court erred in permitting the prosecuting attorney, on cross-examination of defendant Knapp, to impeach his exculpatory statements by alluding to Knapp's pre-arrest silence and post-arrest statements. During direct examination defendant testified that his post-arrest statements to police were inaccurate for various reasons, and then gave a completely different version of the events. On cross-examination, the following exchange occurred:

Q. "Okay. Mr. Knapp, why is it that you waited until this time to let us in on what actually happened?"
Mr. Ellis (defense counsel): "Your Honor, I object."
The Court: "State the basis of your objection."
Mr. Ellis: "It's a comment on his right to remain silent during various times from his arrest until today."

The objection was overruled. Knapp also contends error in the State's closing argument when the prosecutor commented on the defendant's failure to report until trial what he had found at the crime scene. Knapp's objection to the alleged erroneous cross-examination is controlled by our decision in *State v. Wood,* 230

Kan. 477, 638 P.2d 908 (1982), where, in a similar situation, this court stated:

"We find no error in this regard. At the time the question was asked, the evidence showed that defendant had given several inconsistent stories as to what happened at the time of the shooting. The evidence was clear that, from the beginning of the investigation, the defendant had given statements to the police officers and had not invoked his right to remain silent. It is obvious to us that the prosecutor was simply referring to the fact that the defendant had changed his story on several occasions and, under the circumstances, the question cannot reasonably be construed as a criticism of the defendant for refusing to give a statement to the police officers. The question was directed to the fact that defendant had given inconsistent statements. It was not a comment on the defendant's exercise of his right to remain silent." p. 480.

During closing argument the prosecutor stated to the jury:

"Defendant never reported what he had seen until last Friday."

No objection to the comment was made by counsel for the defendant at that time. The Kansas standard for improper prosecutorial conduct during final argument is whether the language used was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. *State v. Henderson*, 226 Kan. 726, 603 P.2d 613 (1979). We conclude that the prosecutor's questions and remarks were less comments on defendant's silence than permissible uses of pre-arrest silence and prior inconsistent statements to impeach defendant's story and constituted proper comment upon the evidence during argument. No error is shown.

Appellant Knapp's final contention on appeal is that the trial court erred in instructing the jury on the doctrine of felony murder under the circumstances of this case. Instruction No. 11 given to the jury reads as follows:

"In the second count of the information, defendant is charged with the crime of murder in the first degree of Jacqueline Musgrave. The defendant pleads not guilty. To establish this charge, each of the following claims must be proved.
1. The defendant killed Jacqueline Musgrave.
2. Such killing was done while in the commission of the act of killing Connie Sue Knapp, a felony;
3. This act occurred on or about the 24th day of September, 1981, in Cowley County, Kansas."

Defendant admits that no objection was lodged against the felony murder instruction at the trial level, but now contends the

instruction was clearly erroneous and therefore constitutes an exception to the contemporaneous objection rule. K.S.A. 60-251(*b*); *State v. Moore,* 230 Kan. 495, 639 P.2d 458 (1982). Defendant claims, among other things, that the murder of his ex-wife cannot be used as the underlying felony to support the first-degree murder conviction for the death of Musgrave. We have thoroughly considered defendant's various theories and arguments and find them to be totally without merit. It would serve no useful purpose to extend this opinion further by a full discussion of the felony murder rule. That has been done numerous times in the past. See *State v. Crump,* 232 Kan. 265, 654 P.2d 922 (1982); *State v. Underwood,* 228 Kan. 294, 615 P.2d 153 (1980), and cases cited therein.

A careful and comprehensive review of the entire record in this case reveals no reversible error.

·The judgment is affirmed.