(179 P.3d 1149)
No. 97,643

STATE OF KANSAS, *Appellee*, v. MICHAEL S. WAGNER, *Appellant*.

Opinion filed March 21, 2008.

*Charles A. O'Hara*, of O'Hara & O'Hara, of Wichita, for appellant.

*Vernon E. Buck*, assistant county attorney, *Marc Goodman*, county attorney, and *Paul J. Morrison*, attorney general, for appellee.

Before GREEN, P.J., GREENE and LEBEN, JJ.

GREEN, J.: Michael Wagner was arrested for suspicious activity and read his *Miranda* rights. He was interrogated at the scene. In a later interrogation, Wagner confessed to committing several burglaries. Wagner moved to suppress his confession and statements. Although the trial court determined that Wagner had been illegally arrested without a warrant or probable cause and that the officers' later search of his pickup truck was unlawful, the trial court found that any taint resulting from the officers' illegality had attenuated by the time of his confession. Therefore, we must determine whether the connection between Wagner's illegal arrest and the unlawful search of his truck and Wagner's later confession was sufficiently attenuated, rendering his confession admissible. Under the facts of this case, the connection between the officers' illegality and Wagner's confession cannot be deemed sufficiently attenuated as to purge the taint. Accordingly, we reverse and remand for a new trial without Wagner's confession or statements.

At 2:17 a.m. on January 22, 2006, Deputy Adam Thompson was on routine patrol in Lyon County when he noticed an unoccupied pickup truck with Sedgwick County tags parked partially on the side of a rural road near the Emporia airport. A field bounded by a barbed wire fence separated the airport from the rural road. The truck was approximately 200 to 300 yards from the airport. Upon approaching the truck, Thompson noticed that the driver's side window was partially down and that the keys were in the ignition. The hood of the truck was still hot. Standing outside the truck, Thompson could see a couple of computers, a box that appeared to contain a GPS system, a camera, and a cell phone inside the truck.

Thompson called for backup, and three other deputies arrived at the scene. One of the deputies testified that he could also see a black briefcase that had the name "Cessna" on it. The deputies heard something in a brush pile near the truck but were unable to locate anyone in the area. Thompson got into the truck and took the keys out of the ignition in order to slow the driver down in the event that the driver returned to the truck while the deputies were searching the area. According to Thompson, his decision to investigate further was based on the fact that there was an "unoccupied vehicle that, you know, there's all these electronics in there, the windows half down, keys in the ignition, you know, on a county road where there's . . . there's nothing there, something, you know, something's going on." While searching the nearby field, the deputies discovered that several strands of the barbed wire fence, which was approximately a car's length away from the truck, had been freshly cut. Thompson put the keys back in the ignition when the deputies finished searching the area.

After searching the area, the deputies drove to a place where they could watch the truck and wait for it to leave. The deputies stopped the truck sometime between 3 a.m. and 3:35 a.m. as it was leaving the area. At least three deputies in three separate patrol cars were involved in the stop. Deputy Daniel Evans ordered the driver, who was later identified as Wagner, to turn off the truck, throw the keys out the window, get out of the truck, and lie on the ground. Evans had his gun pointed at the truck. After Wagner

complied with Evan's orders, Thompson handcuffed Wagner and walked him to his patrol car. Thompson read Wagner his *Miranda* rights and interviewed him outside of the patrol car. The passenger, Melissa Choate, was escorted out of the car, handcuffed, and given her *Miranda* rights. Choate was interviewed separately from Wagner. According to Thompson, both Wagner and Choate were wearing dark clothing.

Wagner told Thompson that he was coming from Wichita to Emporia to meet a friend to play paintball. Nevertheless, Wagner did not know where his friend lived, did not have a phone number, and never made contact with him. On the other hand, Choate said that she and Wagner were on their way back to Wichita from Kansas City where they had been visiting Wagner's sister. Either Wagner or Choate said that they had stopped for a "relationship." When Thompson discovered that Wagner's and Choate's stories did not match, he and another deputy searched the truck. Thompson did not see any additional items in the truck to those that he had seen when the truck was parked on the side of the road. The search of the truck lasted for 20 to 30 minutes and occurred approximately 15 to 20 minutes after the truck was stopped. The deputies did not have permission to search the truck.

Thompson grabbed one of the laptop computers out of the truck and called into dispatch the serial number on the laptop. Thompson discovered that the laptop had been reported stolen in Denver, Colorado. Thompson then took the rest of the electronics out of the truck and called in their serial numbers to dispatch. None of those items were reported stolen. One of the bags in the truck had the name "Cessna" on it. During their search of the truck, the deputies discovered a pair of bolt cutters and a pair of pliers in the toolbox in the back of the truck.

The deputies contacted the Emporia Police Department for assistance. Once the Emporia police officers arrived at the scene, Thompson took Wagner to the Lyon County Jail where he was booked under suspicion of burglary. Choate was taken to the Lyon County Jail by a different deputy. Wagner's truck was impounded by the Emporia police.

Sometime after the arrest, the Emporia police discovered that someone had broken into several hangars at the Emporia Airport. It is unclear when the deputies learned this information. Based on the deputies' testimony, it is undisputed that the deputies did not know about the burglary when they stopped and handcuffed Wagner. One of the deputies indicated that they learned about the burglary around the time they discovered that the laptop computer had been stolen. Another deputy testified that he went to the airport around 3:45 or 4 a.m. to speak with Emporia police officers who had discovered the burglary. After seeing some shoe prints at the airport, the deputy returned to the scene of the stop and noted that Wagner's shoes were similar in design to the shoe prints. Thompson's testimony indicated that he knew about the burglary by the time Wagner was booked into jail.

Wagner was brought from the Lyon County Jail to the Emporia Police Department around 1:34 that afternoon (January 22, 2006). Detective Dennis Delmott and FBI agent Mike Miller interviewed Wagner. Before the interview began, Delmott gave Wagner a form that contained his *Miranda* rights and also read these rights to Wagner at around 1:43 p.m. Wagner waived his rights and agreed to speak with Delmott and Miller. During the interview, Delmott provided Wagner with a soft drink and also offered Wagner some food from the vending machine. Delmott testified that Wagner would have been allowed to go to the bathroom if Wagner had asked. Wagner's handcuffs were removed for the interview.

Wagner initially expressed concern about the legal implications of his interview. Delmott told Wagner that there was a possibility he could be charged in federal court, in Lyon County, and in other counties. Nevertheless, Delmott told Wagner that possibly other jurisdictions would choose to save money and time and not prosecute him if he was being prosecuted in Lyon County. Delmott told Wagner that the best thing he could do would be to cooperate.

During his interview, Wagner said that his girlfriend was pregnant, that he and his girlfriend had children from previous relationships, and that he was making only $10 an hour. Wagner stated that he made extra money by breaking into airports, taking items,

and selling the items on E-bay. When he was questioned about his activities at the Emporia airport, Wagner said that he had used bolt cutters to remove padlocks on the hangars, had entered the hangars, and had taken some GPS systems, a headset, and possibly some booklets. Wagner stated that he had hidden the items underneath a pine tree along a runway on the north end of the airport. Officers later found these items in the area where Wagner had described.

Wagner's interview ended around 4 p.m. After the interview, Wagner was allowed to use a telephone to call his parents. Wagner was then taken back to the Lyon County Jail.

Wagner was charged with six counts of burglary of a nondwelling, four counts of vehicle burglary, two counts of theft, six counts of criminal damage to property, and one count of criminal trespass. Before trial, Wagner moved to suppress the evidence obtained as a result of the searches of his truck and his arrest. Wagner argued that law enforcement officers did not have legal cause to arrest him or to enter and search his truck without his permission.

The trial court held an evidentiary hearing on Wagner's motion to suppress. At the conclusion of the hearing, the trial court determined that although the stop of the truck was supported by reasonable suspicion, the officers did not have probable cause to arrest Wagner. Moreover, the trial court held that the search of Wagner's truck was not lawful.

Nevertheless, the trial court determined that any taint resulting from the seizure of the evidence or from Wagner's arrest was attenuated when Wagner was questioned at the scene of the stop by Lyon County deputies and by the time he was interviewed by Delmott and Miller at the Emporia Police Department. The trial court found that the attenuation was attributable to the fact that Wagner was given *Miranda* warnings, the passage of time between the truck stop and the interrogation at the Emporia Police Department, the voluntary nature of Wagner's statements, and the fact that evidence seized from the truck was not present at or used by the officers during the interrogation. The trial court suppressed the laptop computer and other items seized from the truck but held that all other physical evidence recovered in other locations and all state-

ments made to officers after Wagner's detention and arrest were admissible and should not be suppressed.

Following the trial court's decision on his motion to suppress, Wagner waived his right to a jury trial and agreed to submit the case to the trial court on stipulated facts. In addition, the State agreed to move for dismissal of counts 4 through 19 of the complaint, with the remaining three counts being burglary of a nondwelling in violation of K.S.A. 21-3715(b). Wagner reserved his right to appeal the issues raised in his pretrial motions. The trial court granted the State's motion to dismiss charges and found Wagner guilty of the three counts of burglary of a nondwelling. Wagner was placed on probation for 24 months with an underlying 12-month prison sentence.

### I. *Motion to Suppress*

On appeal, Wagner argues that the trial court erred in not suppressing his statements that he made 10 hours after his illegal arrest and an illegal search of his truck. On the other hand, the State contends that the trial court correctly decided that any taint from the arrest and search of the truck was attenuated by later events and circumstances and that Wagner's statements during the afternoon interrogation were admissible at trial.

### A. *Standard of Review*

When reviewing a trial court's decision on suppression, an appellate court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard with independent judgment. The appellate court does not reweigh the evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *State v. Ackward*, 281 Kan. 2, 8, 128 P.3d 382 (2006). When the material facts to a trial court's decision on a motion to suppress are not in dispute, the question of whether to suppress is a question of law over which an appellate court has unlimited review. *State v. Porting*, 281 Kan. 320, 324, 130 P.3d 1173 (2006). The State bears the burden of proof for a suppression motion. It must prove to the trial court the lawfulness of the search and seizure. *State v. Shelton*, 278 Kan. 287, 292, 93 P.3d 1200 (2004).

## B. *Lawfulness of Arrest and Search*

Initially, the State argues that the trial court erred in determining that Wagner was unlawfully arrested. Importantly, the State did not appeal the trial court's ruling on this issue.

### 1. *Arrest*

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and § 15 of the Kansas Constitution Bill of Rights prohibit unreasonable searches and seizures. *State v. Ramirez*, 278 Kan. 402, 404, 100 P.3d 94 (2004). A warrantless arrest in a public place does not violate the Fourth Amendment or the Kansas Constitution if the arrest is based on probable cause that the person has committed or is committing a felony. 278 Kan. at 405. Under Kansas law, an officer is authorized to make a warrantless arrest when the officer has probable cause to believe that a person is committing or has committed a felony. K.S.A. 22-2401; *Ramirez*, 278 Kan. at 405.

### a. When Was Wagner Arrested?

Under K.S.A. 22-2202(4) and K.S.A. 22-2405(1), a person is considered to be under arrest when he or she is physically restrained or when he or she submits to the officer's custody for the purpose of answering for the commission of a crime. See *State v. Hill*, 281 Kan. 136, 143, 130 P.3d 1 (2006). The test for whether a seizure and an arrest has occurred is based on what a reasonable person would believe under the totality of the circumstances surrounding the incident. *State v. Morris*, 276 Kan. 11, 18-19, 72 P.3d 570 (2003).

Our Supreme Court has held that the use of handcuffs alone does not necessarily convert an investigatory stop into an arrest. *Hill*, 281 Kan. at 142. Nevertheless, in *State v. Payne*, 273 Kan. 466, 468-69, 473, 44 P.3d 419 (2002), our Supreme Court held that the defendant was arrested when law enforcement officers pulled him out of a car, ordered him to the ground, and handcuffed him at gunpoint. Similarly, in *Hill*, our Supreme Court held that the defendant was arrested when a law enforcement officer ordered him from a truck at gunpoint and handcuffed him. 281 Kan. at 145.

Here, after the deputies stopped Wagner's truck, Wagner was ordered at gunpoint to throw his keys out the window, to get out of the truck, and to lie on the ground. Wagner was then handcuffed and led back to a patrol car where he was *Mirandized* and questioned. Wagner was separated from Choate and was in continuous police custody during the stop. His truck was searched without his permission. He was not allowed to drive his truck, and his truck was eventually impounded. Wagner was taken in a patrol car to jail where he was booked on suspicion of burglary. Based on the circumstances surrounding Wagner's initial encounter with the deputies, Wagner was under arrest when he was ordered out of the truck at gunpoint, forced to lie on the ground, and handcuffed. A reasonable person in Wagner's situation would believe that he was under arrest.

b. Was there Probable Cause to Support Wagner's Arrest?

The question now turns to whether the arresting officers, at the time of Wagner's arrest, had probable cause to believe that Wagner had committed or was committing a felony. The trial court held that while the officers had reasonable suspicion of criminal activity, they did not have probable cause to arrest Wagner. This court determines whether there is substantial competent evidence in the record to support the trial court's finding.

Our Supreme Court has defined probable cause as follows:

"Probable cause is the reasonable belief that a specific crime has been or is being committed and that the defendant committed the crime. [Citation omitted.] Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient to assure a person of reasonable caution that an offense has been or is being committed and the person being arrested is or was involved in a crime. The officer's knowledge must be based on reasonably trustworthy information." *Hill*, 281 Kan. at 146.

In determining whether probable cause to arrest exists, a court examines the totality of the circumstances from the standpoint of an objectively reasonable officer. *State v. Ingram*, 279 Kan. 745, 752, 113 P.3d 228 (2005). The appellate court looks at all of the information in the officer's possession, fair inferences drawn therefrom, and any other relevant facts, even if they may not be admissible at trial. *Hill*, 281 Kan. at 146.

In this case, when Wagner was arrested, the deputies knew that Wagner's truck, which had Sedgwick County tags, had been left unoccupied on the side of a rural road approximately 200 to 300 yards from the Emporia airport. The truck was discovered around 2:17 a.m. and, based on the fact that the hood was still hot, the truck had been recently driven. The keys were still in the truck's ignition. A couple of laptop computers, a box that appeared to contain a GPS system, a camera, a briefcase with the name "Cessna" on it, and a cell phone were inside the truck. During a search of the area, the officers discovered that a section of barbed wire fence, which bounded a pasture separating the rural road from the airport, near the truck had been "freshly cut." Around 1 hour after the truck was discovered, the officers stopped the truck as it was leaving the area. Wagner was immediately arrested. Nothing in the record indicates that the officers had received any reports of criminal activity in the area when Wagner was arrested.

In its brief, the State attempts to bootstrap the burglary at the Emporia Airport into the factors giving the officers probable cause to believe that Wagner had committed a felony. The State contends that the officers received the information about the airport burglary before Wagner "was formally arrested and taken to the Lyon County Jail." Nevertheless, the State concedes by this argument that Wagner had been arrested before being taken to the Lyon County jail. Further, the record is clear that the burglary at the Emporia airport was not known to the officers when they stopped and arrested Wagner. If law enforcement officers were allowed to use information gained after an arrest to somehow make the arrest lawful, the protections of the Fourth Amendment would evaporate. For example, any time an officer has a hunch that a person has committed a crime, the officer could arrest that person without probable cause and hold the person in custody until evidence is uncovered. Such actions would not be consistent with the people's Fourth Amendment right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

Rather, probable cause must exist at the time of the arrest. As held by the United States Supreme Court in *Devenpeck v. Alford*, 543 U.S. 146, 152, 160 L. Ed. 2d 537, 125 S. Ct. 588 (2004),

"[w]hether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest. [Citation omitted.]" Similarly, 2 LaFave, Search and Seizure §3.2(d) (4th ed. 2005), states that when a warrantless arrest is made, "the information to be considered is the 'totality of facts' available to the officer *at the time of the arrest or search.*" (Emphasis added.) *State v. Anderson*, 281 Kan. 896, 905, 136 P.3d 406 (2006).

Here, because the officers did not learn about the burglary at the Emporia airport until after Wagner had been arrested and was in police custody, this information is not relevant in determining whether the officers had probable cause to arrest Wagner. See *Anderson*, 281 Kan. at 905 (holding that defendant's flight from officers and his action of discarding drugs after officers attempted to arrest him were not relevant in determining whether officers had probable cause to arrest defendant).

When Wagner was arrested, the information known to the officers did not give rise to probable cause that Wagner was committing or had committed a felony. Indeed, when questioned at the suppression hearing, the officers were unable to articulate any type of felony for which they had arrested Wagner. One of the deputies testified that Wagner had been stopped "just to see what was up" and to "find out what they had been doing out there" due to the time of night, the location to the airport, and the fact that the fence had been cut. Another deputy testified that the intent to stop the truck was to identify the occupants and "determine what was going on" because "with the fence cut we had our suspicions with the residence and the airport we felt there was some type of crime going on or being committed in that area." Finally, Thompson testified that he had placed Wagner in custody "basically, for our safety and to question them, you know, why their truck was there, why the fence was cut, why they had all these electronics in the vehicle, you know, find out what's going on."

The deputies' testimonies highlight the fact that when Wagner was stopped and immediately arrested, the arresting officers did not possess enough information to give rise to probable cause that Wagner had committed or was committing a felony. The officers

were acting on a hunch that Wagner was involved in criminal activity and that the electronics in his car tied into that activity.

This case is like *Taylor v. Alabama*, 457 U.S. 687, 73 L. Ed. 2d 314, 102 S. Ct. 2664 (1982), where the petitioner was arrested without probable cause and entered a confession 6 hours later during a police interrogation. There, the police received an uncorroborated tip from an incarcerated individual that the petitioner was involved in an unsolved robbery. The tip was insufficient to give the police probable cause to arrest the petitioner. Nevertheless, two officers arrested the petitioner without a warrant, searched him, *Mirandized* him, and took him to the police station for questioning. At the police station, the petitioner was fingerprinted, *Mirandized* again, questioned, and placed in a lineup. The police told the petitioner that his fingerprints matched those on some evidence recovered from the robbery. After visiting with his girlfriend and another man, the petitioner waived his rights and confessed to the robbery. In agreeing with the petitioner's argument that the warrantless arrest was not supported by probable cause, the United States Supreme Court found that the petitioner had been arrested "in the hope that something would turn up." 457 U.S. at 691.

Similarly, the deputies in this case arrested Wagner without probable cause in the hope that something would turn up. From the moment they came across Wagner's unoccupied truck containing electronics, the deputies had a suspicion that "something's going on." The deputies' testimony at the suppression hearing indicated that they wanted to find out if Wagner was involved in criminal activity and they suspected that the electronics in the truck might be stolen property. By stopping Wagner and arresting him and Choate, the deputies were able to get into the truck and confirm their hunch that Wagner had stolen property. The evidence did in fact "turn up" after Wagner was arrested without probable cause and his truck was searched without probable cause.

While arguably there was reasonable suspicion of criminal activity to justify detaining Wagner and Choate, the information known to the officers at the time of Wagner's arrest did not establish probable cause to believe that Wagner had committed or was committing a felony. Accordingly, there is substantial competent evidence

in the record to support the trial court's finding that there was not probable cause to arrest Wagner.

### 2. *Search of Wagner's Truck*

The trial court also found that the search of Wagner's truck was not lawful and suppressed the evidence obtained from the search. Warrantless searches are constitutionally prohibited, and unless a search falls within one of a few exceptions, a warrantless search is per se unreasonable. *State v. Ibarra*, 282 Kan. 530, 536, 147 P.3d 842 (2006). Generally recognized exceptions that would apply in cases where a vehicle has been searched include: consent; probable cause to search along with exigent circumstances; the emergency doctrine; inventory searches; plain view; and search incident to a lawful arrest. See *State v. Conn*, 278 Kan. 387, 390-91, 99 P.3d 1108 (2004).

In this case, it is undisputed that Wagner did not consent to the search of his truck. Based on the information available to the officers when Wagner was arrested, the search could not be justified based on probable cause that a crime had occurred. No emergency existed that required the officers to enter Wagner's truck. The officers were not conducting an inventory search. The officers did not observe anything that was illegal in plain view in the truck. Finally, because Wagner was not lawfully arrested, the search could not be justified as a search incident to a lawful arrest. As a result, the record supports the trial court's conclusion that the search of Wagner's truck was unlawful.

### C. *Attenuation*

The question now before us is whether the connection between the illegal arrest of Wagner and the illegal search of Wagner's truck and Wagner's confession was "so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341, 84 L. Ed. 2d 307, 60 S. Ct. 266 (1939). When an initial arrest is not supported by probable cause, if the taint of the illegal arrest is so separate from the statement or evidence obtained, the evidence can be admitted. *State v. Weis*, 246 Kan. 694, 697, 792 P.2d 989 (1990). "[A] confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the

causal connection between the illegal arrest and the confession so that the confession is ' "sufficiently an act of free will to purge the primary taint." ' [Citations omitted.]" *Taylor*, 457 U.S. at 690.

Our Supreme Court has set forth four factors to be considered when determining whether a defendant's confession following an illegal arrest is admissible: (1) whether *Miranda* warnings were given; (2) the proximity of the illegal arrest and the statement or confession; (3) the purpose and flagrancy of the officer's misconduct; and (4) other intervening circumstances. *State v. Hill*, 281 Kan. at 153.

### 1. Miranda Warnings

The State begins by pointing out the fact that Wagner was *Mirandized* at the scene of the stop and again before his interview at the police station. In addition, Wagner signed a document acknowledging that he understood his constitutional rights. Nevertheless, the United States Supreme Court in *Taylor* clarified that "the fact that the confession may be 'voluntary' for purposes of the Fifth Amendment, in the sense that *Miranda* warnings were given and understood, is not by itself sufficient to purge the taint of the illegal arrest." 457 U.S. at 690. The United States Supreme Court has required "not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.' " *Brown v. Illinois*, 422 U.S. 590, 602, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 9 L. Ed. 2d 441, 83 S. Ct. 407 [1963]).

### 2. Proximity of Illegal Arrest and Confession

The State also focuses on the 10 hours between Wagner's arrest and his interview at the police station. Nevertheless, in *Hill*, 281 Kan. 136, the fact that the defendant had been in continuous police custody between his arrest and police interrogation weighed in favor of suppressing the defendant's statements. Here, Wagner was in continuous police custody during the 10 hours between his arrest and interrogation. During this time, Wagner was *Mirandized* and questioned at the scene of the stop, his truck was searched, and he was taken to the police station where he was booked on suspicion

of burglary. Moreover, the deputies and the Emporia police used this time to investigate the burglary at the Emporia airport and to find out information on the Colorado case.

### 3. Purpose and Flagrancy of Officer's Misconduct

*Brown v. Illinois* made clear that "the purpose . . . of the official misconduct" along with the "flagrancy" of that misconduct is a relevant factor to consider. 422 U.S. at 603-04. In *Brown,* two police officers arrested Richard Brown without probable cause and without a warrant for murder. One officer, in making the arrest, pointed his gun at Brown through a window of Brown's apartment as Brown approached the apartment in the evening. The second officer came up behind Brown with his gun aimed at Brown. While both officers held him at gunpoint, the three entered the apartment. Brown was ordered to stand against the wall and was searched. No weapon was found. He was handcuffed and taken to the squad car.

Determining that the purpose of the arrest was "for investigation" or for "questioning," the *Brown* Court stated: "The detectives embarked upon the expedition for evidence in hope that something might turn up." 422 U.S. at 605. The Court, in discussing the flagrant execution of the arrest, stated: "The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion." 422 U.S. at 605. Here, the conduct of the deputies rose to the level of the purposeful and flagrant misconduct noted in *Brown* and in *Hill.*

Like *Brown,* the purpose of Wagner's arrest was for investigation or questioning. The deputies later testified that they made the arrest for the purpose of questioning Wagner and to find out what was "going on." See *Brown,* 422 U.S. at 605. Neither Thompson nor the other deputies involved in the stop had probable cause to arrest Wagner. Moreover, the deputies' actions of ordering Wagner out of the truck at gunpoint, forcing him to lie on the ground, and handcuffing him were flagrant in light of the fact that three different deputies in three separate patrol cars were involved in the stop. Further, the conduct of the deputies in this case was very similar to the conduct of the officer in *Hill.* In *Hill,* our Supreme Court

found that the officer's "actions in ordering Hill out of the truck at gunpoint and handcuffing him were flagrant." 281 Kan. at 154. In addition, the deputies' actions of searching Wagner's truck when they only had reasonable suspicion that something was "going on," not probable cause to arrest or search, was also flagrant. The deputies had earlier observed computers, a GPS system, a camera, and a cell phone in the truck. The evidence suggests that the deputies improperly searched Wagner's truck in hope of confirming their hunch that it contained stolen property.

### 4. Other Intervening Circumstances

The State focuses on several intervening circumstances, including the fact that Wagner was given a drink and was offered a snack during his interview at the police station. The State points out that there was no physical contact made with Wagner during his interview, that his handcuffs were removed, that the officers did not draw their weapons, that the officers answered Wagner's questions during the interview, that no commitments were made about sentencing, and that Wagner never asked for an attorney.

As with the *Miranda* warnings, these facts are all significant in establishing that the confession may be "voluntary" for purposes of the Fifth Amendment. Nevertheless, while these circumstances are all relevant, they are not sufficient enough to purge the taint of Wagner's unlawful arrest and the unlawful search of his truck.

The State also seems to suggest that Delmott's investigation at the Emporia airport burglary and his discovery that specific items missing from the airport had not been found in Wagner's truck were sufficient intervening events to purge the taint of the unlawful arrest and search. The State further points out that the laptop computer found in Wagner's truck and the other evidence recovered from the vehicle stop were not present during the interview.

Although the laptop computer found in Wagner's truck was not brought into the interview, this evidence provided Delmott with leverage to use against Wagner in the interview at the police station. Although there is no indication from the record that Delmott directly questioned Wagner about the laptop computer stolen from Colorado, Delmott testified that he was aware that a laptop that

tied into a Colorado case had been discovered in Wagner's truck. Delmott indicated that before interviewing Wagner, he picked up a police report that pertained to the Colorado case and that had been faxed to the Lyon County Sheriff's Department. Delmott brought in an FBI agent for the interview and told Wagner that he could be prosecuted federally and in other jurisdictions in addition to Lyon County. Presumably, the FBI agent was brought in because of the laptop computer stolen in Colorado and found in Wagner's truck in Kansas. Delmott told Wagner that it would be in Wagner's best interest to cooperate with him and that other jurisdictions might not want to waste the expense and time of prosecuting him if he was prosecuted in Lyon County. It seems that Delmott used the information about the stolen laptop, for which Wagner could potentially face charges in other jurisdictions, to get Wagner to cooperate during the interview.

Moreover, Delmott's investigation at the airport was just a continuation of the investigation that began when Wagner's truck was discovered parked by the side of the road. The deputies' initial suspicions that "something was going on" and that there was some kind of criminal activity in the area were based partly on the fact that Wagner's truck had been parked in a rural area near the Emporia airport and near a freshly cut fence. The deputies acted on their hunch when they arrested and interviewed Wagner, searched of his truck, and contacted the Emporia police. The discovery of the burglary only confirmed the deputies' suspicions that Wagner had been involved in criminal activity in the area. After Wagner was booked into jail, the Lyon County deputies and the Emporia police continued working in conjunction with each other in investigating the Emporia airport burglary. Delmott's investigation at the Emporia airport and his interrogation of Wagner was an uninterrupted connection between the illegal arrest and the illegal search and Wagner's later confession. As a result, it was insufficient to purge the taint from Wagner's illegal arrest and the illegal search of his truck.

Nevertheless, arguing that the four factors identified in *Hill* would render Wagner's statements admissible in this case, the State cites *State v. Hodges*, 252 Kan. 989, 851 P.2d 352 (1993),

and *State v. Knapp*, 234 Kan. 170, 671 P.2d 520 (1983). Unlike the instant case, however, the defendant in *Hodges* initiated his interview with law enforcement after his unlawful arrest. In *Knapp*, the defendant was able to dictate the terms of his statements, interrogation, and the searches. Moreover, the Kansas officers investigating the crime had no part in the illegal arrest of the defendant by military personnel and did not seek such an arrest. Such a record is not present in this case. Wagner was not able to dictate the terms of his statements, interrogation, and searches. Further, the Lyon County officers, who initiated the investigation of Wagner and the Emporia burglary, made the unlawful arrest. Unlike *Knapp*, the Lyon County deputies and the Emporia police officers conducted a joint investigation of the case.

The instant case is similar to *Hill*. There, the defendant and Charles Grandpe were arrested when an officer stopped the two men after he saw them leaving a residence for which a search warrant had been issued. Earlier, officers had collected the trash outside the residence and discovered a methamphetamine lab and mail addressed to Grandpe. Shortly after he was arrested, the defendant was *Mirandized* and questioned about where he lived. The defendant denied that he lived with Grandpe but admitted that he had stayed overnight at the residence the previous night. The defendant was taken to the police station. Approximately 9 hours later, the defendant was interviewed at the police station after the residence had been searched. The defendant was read his *Miranda* rights but chose to speak with the interviewing officer. During the interrogation, the defendant made incriminating statements.

On appeal, our Supreme Court determined that the defendant had been arrested without probable cause. Our Supreme Court then analyzed the four factors to determine whether the defendant's statements during his interrogation at the police station were tainted by his earlier unlawful arrest. Our Supreme Court noted that the only factor that weighed in favor of attenuating the unlawful arrest and admitting the defendant's statements was that the officer *Mirandized* the defendant before the statements were made. The other three factors, however, weighed in favor of suppressing the defendant's statements. Finding that the defendant's

statements resulted from the exploitation of the unlawful arrest, our Supreme Court ordered the statements suppressed.

The State attempts to distinguish *Hill* from the facts of this case by pointing out that our Supreme Court in *Hill* determined that the defendant's detention was not supported by reasonable suspicion. Nevertheless, the fact that a defendant could have been detained on reasonable suspicion does not make his or her arrest any less unlawful. Rather, as stated earlier, the question is whether the illegal arrest and search is so separate from the statement or evidence obtained so as to purge the taint of the illegal arrest and search to render the evidence admissible. See *Weis*, 246 Kan. at 697.

Further attempting to distinguish the facts in *Hill* from this case, the State points out that the officers in *Hill* seized keys from the defendant's pocket at the scene of the vehicle stop and, after persistent questioning, the defendant told the officers which key opened the door to the house that was under surveillance in the drug investigation. In the instant case, however, the officers also seized evidence after Wagner was unlawfully arrested. The officers searched Wagner's car and seized various items, including a laptop computer, which they found out had been stolen in Colorado. It appears that this evidence was later used as leverage against Wagner during his interview.

As in *Hill*, the only factor weighing in favor of attenuating the unlawful arrest and admitting Wagner's confession is that Wagner was given *Miranda* warnings before he made his statements. The remaining three factors all weigh in favor of suppressing Wagner's confession. Wagner was kept in continuous police custody between his illegal arrest and his confession at the police station. During those 10 hours, he was questioned, his truck was searched, and he was taken to jail where he was booked on suspicion of burglary. The flagrancy of the deputies' misconduct was not justified based on the circumstances surrounding the arrest and search. Finally, there were no intervening circumstances between Wagner's arrest and his interrogation sufficient to purge the taint of Wagner's illegal arrest and the illegal search of his truck. As a result, the record does not contain substantial competent evidence to support the

trial court's finding that any taint resulting from the seizure of the evidence or Wagner's arrest was attenuated by the time Wagner was questioned at the police department.

Under all of the circumstances, the connection between Wagner's illegal arrest and the illegal search of his truck and Wagner's confession cannot be deemed "so attenuated as to dissipate the taint." See *Nardone*, 308 U.S. at 341. Because Wagner's confession resulted from the exploitation of the unlawful arrest and the evidence obtained during the unlawful search of his truck, Wagner's confession was inadmissible at trial and should have been suppressed. Accordingly, we reverse Wagner's convictions and remand the case for a new trial without Wagner's confession or statements.

Reversed and remanded for a new trial.

LEBEN, J., concurring: I join the opinion of the court in all respects but one. In discussing the factors for determining whether the defendant's confession after an illegal arrest may nonetheless be admitted, the court concludes that the officer's misconduct was "flagrant." The court finds that it was flagrant to order Wagner out of his truck at gunpoint, force him to lay on the ground, and handcuff him when there was not probable cause to arrest him.

The majority is right in noting that flagrant misconduct was found in *State v. Hill*, 281 Kan. 136, 130 P.3d 1 (2006), but the facts leading to the use of force in our case are quite different. In *Hill*, a police officer ordered Hill at gunpoint from his car while stopped on a city street in Salina. The officer had no cause to suspect Hill of anything other than being with another person whose home was about to be searched under a pending search warrant. In our case, the officers had found an unoccupied pickup truck on a deserted country road in the middle of the night with the hood warm and the keys in the ignition. No one came back to the truck for about an hour, during which time the officers found the barbed wire fence nearby had been freshly cut. Even though they did not have probable cause to arrest anyone, they had reason to believe that "something's going on," and that something could well have involved a danger to the officers.

In this context, while the officer's initial actions in taking Wagner into custody may seem overly precautious when the officer does not yet have probable cause to make an arrest, they were not altogether unrelated to the dangers at hand. Thus, I would not label the amount of force initially used to take Wagner into custody flagrant misconduct. The real misconduct here was arresting a person without probable cause, which has often been considered purposeful or flagrant misconduct. See *Brown v. Illinois*, 422 U.S. 590, 605, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975) (finding illegal arrest "had a quality of purposefulness" when detectives arrested defendant for investigatory purposes "in the hope that something might turn up"); *Dunaway v. New York*, 442 U.S. 200, 216, 60 L. Ed. 2d 2824, 99 S. Ct. 2248 (1979) (same); *Taylor v. Alabama*, 457 U.S. 687, 690-91, 73 L. Ed. 2d 314, 102 S. Ct. 2664 (1982) (same).

Whether we call the police misconduct purposeful or flagrant here does not affect the result in this case, and I agree fully with the remainder of the opinion. Wagner was in custody for 10 straight hours here before he made his statement, and he had no reason to believe he would be released anytime soon. The officers had told him that he was being investigated by federal authorities and others but that a confession to the Emporia officers might well make things easier for him. In these circumstances, the effects of the unlawful arrest were not attenuated, as the court's opinion properly concludes. See *Taylor*, 457 U.S. 687 (confession not admissible when only 6 hours elapsed between illegal arrest and confession and defendant in police custody entire time). The result would be the same here whether Wagner had been nicely asked to exit the vehicle and then arrested or whether, as occurred, he was forced from the vehicle at gunpoint.